HIBSCHMAN PONTIAC, INC. *v.* JAMES B. BATCHELOR AND
GENERAL MOTORS CORPORATION.

[No. 577S312. Filed May 13, 1977.]

*R. Wyatt Mick, Jr.,* of Mishawaka, for appellant.

*Myron J. Hack,* of South Bend, *Edward A. Chapleau,* of South Bend, for appellee.

GIVAN, C.J.—Batchelor brought an action for breach of contract and oppressive conduct by Hibschman Pontiac, Inc. and General Motors Corporation. A trial before a jury resulted in a verdict for Batchelor and against Hibschman Pontiac and General Motors Corporation in the amount of $1,500.00. Further, the jury assessed punitive damages against Hibschman Pontiac, Inc. in the amount of $15,000.00.

The Court of Appeals, Third District, reversed the grant of punitive damages. See 340 N.E.2d 377. Batchelor now petitions for transfer.

The record reveals the following evidence: Prior to buying the Pontiac GTO automobile involved in this case, Batchelor inquired of the salesman, the service manager and the vice president as to the quality of Hibschman Pontiac's service department, as it was important that any deficiencies in the car be corrected. The salesman and the service manager

responded that the service department at Hibschman Pontiac was above average. Jim Hibschman, the vice president, assured him that he would personally see that any difficulties would be corrected. Batchelor stated that he relied on the statements of the three men and ordered a 1969 GTO Pontiac automobile.

When Batchelor picked up his new car he discovered several problems with it. As requested by the service manager of Hibschman Pontiac, Batchelor made a list of his complaints and brought the car in for repair a few days later. The service manager attached the list to a work order but did not list the deficiencies on the work order. Later the manager called Batchelor and said that the car was ready. When he picked up the car Batchelor noticed that several items on the list had not been touched. Batchelor testified that there were many occasions when he took the car to Hibschman Pontiac for repairs and the service manager told him that the defects had been fixed when in fact they were not fixed. Batchelor testified that the service manager knew the defects were not corrected, but represented to him that the defects were corrected. Batchelor stated that he relied on the service manager's statements and took the car on several trips, only to have it break down. Some of the deficiencies resulted in abnormal wear of the car and breakdowns after the warranty period had expired.

Batchelor testified that he had taken the car in for repairs five times before he had owned it a month but that the defects had not been corrected. Batchelor had taken the car in 12 times during the warranty period for overnight repair and at least 20 times in all during the period. During the warranty period Batchelor lost use of the car approximately 45 days while it was at Hibschman Pontiac.

Batchelor had appealed to Jim Hibschman on several occasions to take care of his car. Hibschman replied that he realized the repairs were not effected properly but that Hibschman Pontiac would "do everything to get you happy."

On another occasion Jim Hibschman responded they had done all they could with the car but that Batchelor was just a particular, habitual complainer whom they could not satisfy and "I would rather you would just leave and not come back. We are going to have to write you off as a bad customer."

On several occasions Batchelor attempted to see Dan Shaules, an area service representative from Pontiac Division, about the car but was kept waiting so long that he had to leave without seeing him. Batchelor did see Shaules in Buchanan, Michigan, when he took the car to an authorized Pontiac dealer there after the warranty had expired. Shaules inspected the car and told Batchelor to return the car to Hibschman Pontiac for repairs.

Hugh Haverstock, the owner of the garage where several of the deficiencies were corrected after the expiration of the warranty, testified that Batchelor was a good customer and paid his bills. He stated that an average transmission man could have corrected the problem with the transmission and that a problem with the timing chain was discovered and corrected when a tune up lasted only 800 miles. Haverstock stated that the difference in value of the car without defects and with the defects it had was approximately $1,500.00. Haverstock testified that when a person complains about problems with cars that have not been fixed by dealerships, word gets out and others do not want to work on the cars.

Arnold Miexel, the service manager for Hibschman Pontiac during the time in question, testified that his representation to Batchelor regarding Hibschman Pontiac service department was based on the fact that the mechanics were factory trained and that he had received no complaints regarding their work. He further stated that he could not check the work of the mechanics. Miexel testified that if their work was unsatisfactory it was done over but no work order was written for it. He stated that it was possible Batchelor made complaints about the car, but the defects were not corrected. The

warranty expired and, as a consequence, later work was not considered under warranty.

Dan Shaules testified that Miexel was an average service manager. He testified that not all of the deficiencies in the car were corrected properly. He further stated that if any defects in the car were brought to their attention within the warranty period, items would be corrected if necessary after the warranty had expired.

Appellant first argues that there was insufficient evidence to permit the issue of punitive damages to go to the jury and that the court should have rendered a directed verdict on the issue of punitive damages on behalf of Hibschman Pontiac. This Court has recently dealt with the question of punitive damages in a contract action. In *Vernon Fire & Casualty Ins. Co.* v. *Sharp,* (1976) 264 Ind. 599, 349 N.E.2d 173, the majority restated the general provision that punitive damages are not recoverable in contract actions and went on to state exceptions to this rule. Where the conduct of a party, in breaching his contract, independently establishes the elements of a common law tort, punitive damages may be awarded for the tort.

Punitive damages may be awarded in addition to compensatory damages "whenever the elements of fraud, malice, gross negligence or oppression *mingle* in the controversy." (emphasis supplied.) *Vernon Fire & Casualty Ins. Co.* v. *Sharp, supra,* 264 Ind. 599, 609, 349 N.E.2d 173, 180, quoting *Taber* v. *Hutson,* (1854) 5 Ind. 322.

Further, where a separate tort accompanies the breach or the elements of tort mingle with the breach, it must appear that the public interest will be served by the deterrent effect of the punitive damages. *Vernon Fire & Casualty Ins. Co.* v. *Sharp, supra.*

Appellant urges that the evidence presented does not indicate tortious conduct of any sort on its part. While a reasonable inference could be made from the evidence that appellant merely attempted to fulfill its contract and to do no more than that contract required, it is also

reasonable to infer that Hibschman Pontiac acted tortiously and in willful disregard of the right of Batchelor. This Court has often stated the maxim that it will not reweigh the evidence nor determine the credibility of witnesses, but will sustain a verdict if there is any evidence of probative value to support it. *Moore* v. *Waitt,* (1973) 157 Ind App. 1, 298 N.E.2d 456; *Smart and Perry Ford Sales, Inc.* v. *Weaver,* (1971) 149 Ind. App. 693, 274 N.E.2d 718.

A corporation can act only through its agents, and their acts, when done within the scope of their authority, are attributable to the corporation. *Soft Water Utilities, Inc.* v. *LeFevre,* (1974) 159 Ind. App. 529, 308 N.E.2d 395.

Here, the jury could reasonably have found elements of fraud, malice, gross negligence or oppression mingled into the breach of warranty. The evidence showed that requested repairs were not satisfactorily completed although covered by the warranty and capable of correction. Some of these defects were clearly breaches of warranty. Paint was bubbled, the radio never worked properly, the hood and bumper were twisted and misaligned, the universal joints failed, the transmission linkage was improperly adjusted, the timing chain was defective causing improper tune-ups and the carburetor was defective, among other things. Batchelor took the car to the defendant with a list of defects on numerous occasions and picked up the car when told it was "all ready to go." It was reasonable to infer that the defendant's service manager represented repairs to have been made when he knew that the work had not been done and that in reliance on his representations, Batchelor drove the car on trips and had breakdowns. Before purchasing the car Batchelor was given special representations on the excellence of Hibschman's service department, and the jury could find that Batchelor relied on these in buying the car from the defendant. After having brought the car in on numerous occasions, Batchelor was told by Jim Hibschman, "I would rather you would just leave and not come back. We are going to have to write you off as a bad

customer." And he was told by one of Hibschman's mechanics that, "If you don't get on them and get this fixed, they will screw you around and you will never get it done." From these statements the jury could infer that the defendant was attempting to avoid making certain repairs by concealing them during the period of the warranty. Batchelor gave the defendant numerous opportunities to repair the car and the defendant did not do so; instead he tried to convince Batchelor that the problems were not with the car, but rather with Batchelor. We are of the opinion that in this case the jury could have found there was cogent proof to establish malice, fraud, gross negligence and oppressive conduct.

Although fraudulent conduct was not alleged in the complaint, evidence on the subject was admitted. Any inconsistency between the pleadings and proof will be resolved in favor of the proof at trial. *Ayr-Way Stores, Inc.* v. *Chitwood,* (1973) 261 Ind. 86, 300 N.E.2d 335; *Vernon Fire & Casualty Ins. Co.* v. *Sharp, supra.* Thus there was probative evidence supporting the claim for punitive damages. The trial court did not err in denying a directed verdict as to that issue. See *Jordanich* v. *Gerstbauer,* (1972) 153 Ind. App. 416, 287 N.E.2d 784.

Appellant next presents a collective argument for three issues: whether there was sufficient evidence to support an award for punitive damages in the amount of $15,000; whether the award of $15,000 punitive damages bears a reasonable relationship to the actual damages; and whether punitive damages of $15,000 is excessive in this case.

Appellant here urges that there was no evidence presented concerning its worth or ability to pay. In *Physicians Mutual Ins. Co.* v. *Savage,* (1973) 156 Ind. App. 283, 296 N.E.2d 165, the Court of Appeals held that the assessment of punitive damages in the amount of $50,000 "was not excessive when considered in relation to the evidence available to the trial court." The opinion noted that included in the evidence was a statement of net worth of the defendant. In *Manning* v. *Lynn Immke Buick, Inc.,* (1971) 28 Ohio App.2d 203, 276

N.E.2d 253, the court held that where punitive damages are to be assessed, the wealth of the defendant may be shown so that the jury will assess damages that will punish him. Such a rule is based on the theory that it will take a greater amount of penalty to dissuade a rich person than a poor person from oppressive conduct. However there appears to be no requirement that evidence of worth be submitted in cases of punitive damages.

Indiana has followed a rule that punitive damages in a proper case may be assessed by the jury within their sound discretion guided by proper instructions given by the court. *Murphy Auto Sales v. Coomer,* (1953) 123 Ind. App. 709, 112 N.E.2d 589. There is no rule that the amount of punitive damages must be within a certain ratio to compensatory damages, although in the case of *Bangert v. Hubbard,* (1955) 127 Ind. App. 579, 126 N.E.2d 778, a malicious prosecution suit, the court held that punitive damages of $10,500, being 105 times the compensatory damages, was so excessive as to indicate that the verdict was given under the influence of passion and prejudice. In *Lou Leventhal Auto Co. v. Munns,* (1975) 164 Ind. App. 368, 328 N.E.2d 734, the Court of Appeals held that punitive damages in the amount of $1,500 was not excessive, although it was 50 times greater than the compensatory damages proven. That case involved an action to replevin an automobile wrongfully repossessed by a dealer. As noted by Judge Lowdermilk, the high ratio of punitive damages to compensatory damages "alone is not conclusive of an improper award. The amount here awarded is not so large as to appear the result of passion or prejudice, and is therefore not excessive." 164 Ind. App. at 380, 328 N.E.2d at 742.

In the case at bar, although it was within the province of the jury to assess punitive damages, the amount in this case is so high as to violate the "first blush" rule as set out in *City of Indianapolis v. Stokes,* (1914) 182 Ind. 31, 105 N.E. 477:

"Damages are not to be considered excessive unless at first blush they appear to be outrageous and excessive or it is apparent that some improper element was taken into account by the jury in determining the amount."

For the above reasons transfer is granted and the cause is remanded to the trial court with instruction to order a remittitur of $7,500 of the punitive damages. In the event the remittitur is not made, the trial court shall order a new trial. The trial court is in all other matters affirmed.

Arterburn and Hunter, JJ., concur; DeBruler, J., concurs in result with opinion; Prentice, J., dissents.

OPINION CONCURRING IN RESULT

DEBRULER, J.—I agree that the punitive damage award of $15,000.00 was excessive, and that remittitur of $7,500.00 is reasonable. However, I doubt the efficacy of the standard enunciated by the majority for the review of punitive damages awards, the "first blush" rule. This rule is vague and contains no objective standards for the evaluation of such awards in view of their purpose, the deterrence of tortious conduct, and the danger to be guarded against, awards motivated by vindictiveness and prejudice. I believe that we should undertake to define a standard of review of punitive damages which imposes objective limitations upon such damages.

NOTE.—Reported at 362 N.E.2d 845.