ART HILL FORD, INC.,
Defendant-Appellant,

v.

Kenneth CALLENDER and Jeannette
Callender, Plaintiffs-Appellees.

No. 3–879A217.

Court of Appeals of Indiana,
Third District.

June 30, 1980.

Joel C. Levy and Gregory R. Lyman, Singleton, Levy & Crist, Highland, for defendant-appellant.

Robert M. Schwerd and William J. Cunningham, Smith, Hilbrich, Cunningham & Schwerd, Highland, for plaintiffs-appellees.

GARRARD, Presiding Judge.

Kenneth Callender and his mother Jeannette Callender brought this action against Art Hill Ford, Inc. and Ford Motor Company alleging breach of warranty and negligence. The jury returned a verdict against both defendants. Compensatory damages were assessed against Art Hill Ford in the amount of $2,411.00 and punitive damages were assessed in the amount of $7,000.00. Against Ford Motor Company compensatory damages were assessed in the amount of $4,822.00. The trial court entered judgment on the verdict as to Art Hill Ford.and, after a remittitur, entered judgment against Ford Motor Company for $2,411.00.

Ford tendered $2,439.00 (the judgment plus costs) to the Callenders and the trial court entered an order of satisfaction of the judgment on the compensatory damages as to both Art Hill Ford and Ford Motor Company.[1]

Art Hill Ford, on appeal, challenges the award of punitive damages. It contends that the evidence is insufficient to sustain the award.

■ Punitive damages have been held recoverable in contract actions where the evidence independently establishes the element of an intentional common law tort or where the elements of fraud, malice, gross negligence or oppression mingle in the controversy. In addition, it must be shown that the public interest will be served by the deterrent effect of the punitive damages. *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845; *Vernon Fire & Casualty Ins. Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173.

■ While a party establishing a breach of contract is entitled to compensatory damages, he must show more to recover punitive damages. He must show that the breaching party has committed a serious wrong tortious in nature. *Hibschman, supra.* An award of punitive damages cannot be sustained by a showing of mere negligence, mistake or delay. The conduct which will support such an award is conduct which can be classified as reprehensible in nature. *Prudential Insurance Co. v. Executive Estates* (1977), Ind.App., 369 N.E.2d 1117.

"Punitive damages are appropriate where there is evidence of an independent tort of a 'reprehensible' nature, where the record indicates a state of mind evidencing bad faith, or where the actor's conduct has a quality that characterizes it as 'reprehensible' as where there is evidence of a consciousness of an intended or probable effect calculated to unlawfully injure the personal safety or property rights of others."

*First Federal Savings and Loan Assoc. v. Mudgett* (1979), Ind.App., 397 N.E.2d 1002, 1008.

Our extensive review of the evidence in the case before us has failed to reveal evidence to sustain a finding of either the necessary independent tort or of a serious wrong tortious in nature.

The evidence in the light most favorable to the verdict reveals that Kenneth Callender purchased a 1976 Ford four-wheel drive pickup truck designed for off-road use from Art Hill Ford on April 20, 1976. Two days later, while driving off the road, the front axle broke. Due to the nature of the damage, Art Hill Ford had the vehicle inspected by a Ford Motor Company representative so that repair could be authorized under the warranty before work began. The representative inspected the truck and authorized the repair in the last week of April. After the work was authorized, the Callenders were told that the parts had to be ordered and would take 10 days to two weeks to arrive. In Mid-May, Kenneth contacted Art Hill Ford and was told that the parts had not arrived and were on back order. Art Hill Ford was contacted on a regular basis thereafter and each time the Callenders were told that the parts were still on back order. Kenneth was told on several occasions that the truck would be ready the "next week." At the end of May, Mrs. Callender was told that the truck would definitely be repaired by the Fourth of July holiday weekend. On July 2, Kenneth was permitted to take the truck although the repair to the front axle was not yet completed since a part had not come in. Because the truck was not completely repaired, some restrictions were imposed on the use of the truck.

Art Hill Ford blamed the delay in fixing the truck on the difficulty in obtaining the necessary parts. The parts manager testified that the part was not in stock in any Ford parts depot in the United States and that a front axle was not a part that a dealer would normally have in stock. Further compounding the difficulty was the

---

1. The Callenders do not challenge the propriety of the satisfaction of judgment.

fact that the incident occurred just prior to a new model year. The parts manager testified that he made numerous calls to Ford and other dealers around the country in order to locate the necessary parts.

Over the Fourth of July holiday, the Callenders went on a trip to Benton Harbour, Michigan in the truck. On the way, Kenneth noticed a strange noise he later determined to be a problem with the transfer case. He returned the truck to Art Hill Ford on July 19th and was told that the truck would be repaired.

Kenneth, who had training in automotive repair, testified that the transfer case should have been inspected and repaired when the front axle was repaired. He stated that when the front housing of the axle breaks, the drive shaft will go back up in the transfer case causing damage. Art Hill Ford admittedly did not inspect or repair the transfer case when the axle was repaired. The testimony of Ford Motor Company witnesses, who also were qualified as experts, was that if the axle had broken under the circumstances as described by Kenneth, the transfer case would not have been damaged and there would be no reason to inspect it.

Repairs to the transfer case were not completed until October 18, 1976. Again the necessary parts were not normally kept in stock by a dealer. Nor were the parts available from any Ford parts depot in the United States. The parts manager at Art Hill Ford again had to call Ford Motor Company and other dealers several times attempting to obtain the various parts. Besides the difficulties encountered because of the change in the model year, further problems arose in September because of a strike at Ford Motor Company during which no parts could be delivered.

Mrs. Callender contacted the Ford MOtor Company's customer service department located in Melrose Park, Illinois. This department was also unable to obtain the necessary parts to repair the truck. Eventually the major part necessary for repair was obtained by Melrose Park from a dealer in Oklahoma. After this part was delivered, Mrs. Callender was told by Art Hill Ford that the truck would be ready on September 24. However, Art Hill Ford subsequently discovered that additional parts were needed to complete the repair. These parts also had to be ordered causing an additional delay.

Kenneth testified that he knew that the repair was a major one and it was difficult to tell what was wrong until the unit was taken apart and put together again.

Kenneth testified that the salesmen he dealt with and the parts department were fair and cooperative. The salesmen tried to help him and showed concern for him as a customer. They were not happy that the parts could not be located to fix the truck. Kenneth thought that Art Hill Ford had made a sincere effort to find the parts. However, he testified that he felt he was being ignored in that when he and his mother would enter the dealership everyone would take off running. He also felt that Art Hill did not cooperate with them and Melrose Park in their attempt to obtain the parts. Kenneth further complained that Art Hill Ford would not use parts from other trucks or obtain used parts although he was aware and understood that the warranty required the use of new Ford parts. Kenneth also complained that Art Hill Ford did not offer the use of another vehicle while the truck was being repaired.

In August, Kenneth had "words" with the general manager of Art Hill Ford during a discussion concerning Mrs. Callender's car which was also in for repairs. Kenneth had accused Art Hill Ford of scratching this car. At one point during the discussion, the manager raised his fist at Kenneth and told him that he (Kenneth) did not know what he was talking about and had caused enough trouble. The manager stated that he wanted them both out of there. Both Callenders testified that this discussion did not concern the truck.

This suit was filed by the Callenders on October 15, 1976. Art Hill Ford telephoned Mrs. Callender on the 18th and told her that the truck could be picked up. This was verified by a letter addressed to Kenneth dated October 25.

On October 22, Art Hill Ford had the Ford representative, who had authorized the repair under warranty on the axle, inspect the truck to see if it was acceptable or deliverable. This was done because the Callenders had been notified and had not picked up the truck. In December, the attorney for Art Hill Ford wrote the following letter to the Callenders' attorney:

"As I advised you on December 8, 1976, the plaintiffs' vehicle was repaired on October 18, 1976 and by letter of that date they were advised that they could pick up the vehicle. I have also advised you that Art Hill Ford, Inc., pursuant to normal procedures because of the age of the vehicle, has tendered the claim under warranty to Ford Motor Company. In the event that Ford Motor Company does not accept the claim under warranty, it will be necessary for the plaintiffs to pay for the costs of repair.

It is our belief that the vehicle was abused by Kenneth Callendar [sic] in the way he operated the vehicle and therefore we do not believe that it was within the warranty and we cannot give much hope that Ford Motor Company will accept this under warranty."

The repair of the axle had been authorized under the warranty by a Ford Motor Co. representative as a matter of customer good will because there was some question as to whether the truck had been abused by Kenneth. Art Hill Ford did not seek prior warranty authorization for the repair of the transfer case and Ford did not require that such prior authorization be obtained. Where it is not obtained, Art Hill Ford submits a warranty claim which is reviewed by Ford. Ford requires the dealer to retain the replaced part for its inspection until after the claim is approved. Art Hill Ford had no way of knowing whether or not the claim would be accepted until after it was paid. The record reveals that Ford paid for the repairs under the warranty in March 1967, at which time the Callenders took possession of the truck.

■ This evidence adequately supports the jury's finding that Art Hill Ford breached its warranty of prompt service. The Callenders were therefore entitled to recover all actual and consequential damage suffered by them as a result of the breach. Inasmuch as the jury's award of $2,411.00 compensatory damages is not challenged, we must conclude that the Callenders were fully compensated for the breach. On the other hand, the evidence does not rise to the level of conduct required for an award of punitive damages. The evidence does not reveal conduct on the part of Art Hill Ford which could be characterized as reprehensible or malicious. There is nothing in these facts that can be described as an intentional tort, fraud, deceit, false representation, gross negligence, or oppression mingled with the controversy. Therefore, that part of the judgment awarding punitive damages must be reversed.

Reversed in part; affirmed in part.

HOFFMAN, J., concurs.

STATON, J., dissents and files separate opinion.

STATON, Judge, dissenting.

I dissent. I do not dispute the accuracy of the Majority's characterization of its evidentiary review as "extensive". But its evidentiary review departs from the standard of review which binds this Court's adjudication of challenges to factual determinations. This departure from the proper standard of review results in a reversal of the jury's award of punitive damages to Kenneth and Jeannette Callender; when the proper standard of review is applied to the evidence, we can not say as a matter of law that the jury's award was wholly unsupported by the evidence. The Majority has usurped the fact finder's role in the judicial process.

The standard of review which the Majority has departed from was explained in *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845, one of this State's leading cases in the law of punitive damages; Justice Hunter wrote

"This Court has often stated the maxim that it will not reweigh the evidence nor

determine the credibility of witnesses, but will sustain a verdict if there is any evidence of probative value to support it. *Moore v. Waitt* (1973), 157 Ind.App. 1, 298 N.E.2d 456; *Smart and Perry Ford Sales, Inc. v. Weaver* (1971), 149 Ind.App. 693, 274 N.E.2d 718."

362 N.E.2d at 845. Here, there is clearly evidence of probative value—some summarized by the Majority and some not—to support the jury's verdict.

The jury could have concluded from the evidence that the conduct of Art Hill Ford amounted to nothing more than a failure to satisfy the warranty of prompt service. But, it did not. From the evidence presented, it concluded that there was oppressive conduct on the part of the Art Hill Ford dealership and that there were other elements of tortious conduct which entitled the Callenders to punitive damages. If there is evidence in the record to support this factual determination by the jury, it is not the prerogative of the appellate tribunal to substitute its factual determination for that of the jury. In *Hibschman Pontiac, Inc. v. Batchelor, supra,* our Indiana Supreme Court was faced with precisely the same question after it was determined that oppressive conduct existed. The factual circumstances in *Hibschman* are very similar to the factual circumstances presented to the jury here.

The record indicates that Ken Callender purchased his Ford truck from Art Hill Ford sometime in March of 1976. Ken Callender testified that during his conversations with Art Hill's salesmen prior to his purchase of the truck, he twice inquired whether the truck was built for use "off the road." The salesmen assured him, as well as his mother, who was present and co-signed for the truck, that the truck had heavy-duty suspension and was built for off the road use.

On April 20, 1976, Callender took possession of his truck. Three days later, an axle broke on the truck as Callender proceeded down an unpaved trail for cars and bikes. He described the incident in the following manner:

"I was back there going down the trail and there was a minibike on one side and on the other side of me and there was a Volkswagen coming towards me. There was a hole in the middle of the trail to where I could get off so the Volkswagen could get around me because there was another tree there too. I go through the hole between five and ten miles an hour, if that fast, because I had kids around me on both sides. I come out of the hole, the front end never left the ground, bounced twice and all of a sudden I go off to the left. So, I thought I was just stuck. I put it in reverse, tried to get out and I couldn't move. I asked my partner to get out of the truck, he got out of the truck and shook his head. So, then I crawled out of the truck. I seen the left side tire pointing—the top of the tire was in towards the inside fender well and bottom was sticking out and I knew what had happened."

After this inspection of the truck, it was towed to Art Hill Ford.

One week later, a Ford Motor Company Dealer representative inspected the truck and authorized that the costs of repair be covered under warranty. Art Hill then told Callender that it would take two weeks to obtain the parts necessary for repair. About one and a half weeks later, Callender inquired about the status of the truck; Art Hill Ford responded that the parts had been placed on "back order". Repeated telephone inquiries and personal visits by Callender to Art Hill Ford during the next month prompted the same response form the dealership—that the parts were on "back order". Callender testified that personnel at Art Hill Ford would "take off running" when he and his mother entered the dealership; similarly, he was often placed on "hold" over the telephone.

In the face of Art Hill Ford's inaction, Callender's mother contacted the Ford Dealer Representative in Melrose Park, Illinois, regarding the necessary parts. The representative ran a computer check of inventory at Ford warehouses, located the parts, and had them shipped to Art Hill

Ford. Eventually, in response to an inquiry in late May, Callender was informed that the truck would be ready for him by July 4, 1976.

Callender picked up the truck on July 2 and was informed that a spring for the front hubs had not been delivered. Art Hill Ford also informed him that during his contemplated trip to Michigan over the July 4th weekend, he should not use the 4-wheel drive, should not drive the truck over fifty miles per hour, and should not take the truck "off the road." Art Hill Ford also informed Callender that there was a sound coming from the truck which he did not need to worry about—"that it [the sound] would take care of itself."

During his trip to Michigan, Ken Callender became concerned over the crackling noise coming from the truck. Based on his mechanical experience and inspection of the truck, he concluded that the noise was coming from the transfer case located near the previously-broken axle. He returned the truck to Art Hill Ford on July 19, and he informed the dealership of the source of the noise.

Art Hill Ford had not inspected the transfer case when the truck was in its shop with a broken axle. Conflicting testimony was presented with respect to whether the transfer case should have been inspected at that time.[1] Callender testified that based on his experience, the fact that the axle had been broken in turn warranted an inspection of the transfer case, since the broken axle would likely have pushed a driveshaft into the case. Although Art Hill Ford's testimony indicated that the circumstances surrounding the break in the axle ruled out the need to examine the transfer case, it is undisputed that a driveshaft (albeit a rusty one) was replaced at the same time that the axle was repaired.

Art Hill Ford agreed after an inspection of the transfer case that the transfer case had been damaged and would have to be replaced. Once again, Callender was in-

formed that it would take a week or two for Art Hill Ford to obtain the necessary parts. Again, Callender's later inquiries to Art Hill Ford resulted in the response that the parts had been placed on "back order".

Finally, in August, the Callenders and Art Hill Ford's General Manager engaged in a verbal dispute over Art Hill Ford's handling of Jeannette Callender's car, which was also at the dealership for repair. Although the Majority has indicated that the incident was wholly unrelated to the truck problems, the General Manager's admonishments to the Callenders clearly suggest that the incident was merely part of the continuing difficulties between the parties. As he raised his fist at Ken Callender, he told the Callenders that they had caused "enough trouble."

Thereafter, Ken Callender's telephone inquiries, wherein he was oftentimes placed on hold for long periods of time, received either of two responses: (1) the parts were not available, or (2) the truck would be ready in a week. During that time Ken Callender drove past the dealership many times and always observed his truck located in the same spot outside the building.

Finally, on October 15, 1976, the Callenders initiated this lawsuit. Three days later, Art Hill Ford called the Callenders to inform that the truck had been repaired and was ready for them.

While the Majority has indicated, as some testimony suggested, that the long delays in the repair of the truck were occasioned by a shortage of available parts for the new truck, *Richard Karchunas of Ford Motor Company's Marketing Division in Dearborn, Michigan testified that he knew of no such shortage.*

Based on this evidence, the jury could reasonably have found elements of fraud, misrepresentations, malice, gross negligence, or oppression mingled with the breach of warranty. When confronted with

---

1. I do not imply that it is our province to weigh the evidence. I point out that the evidence was conflicting merely because the Majority has summarized both aspects of this particular factual aspect.

strikingly similar conduct by an auto dealer in *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845, our Supreme Court refused to reverse a jury's award of punitive damages.[2]

In reversing the jury's award of punitive damages here, the Majority has departed from the appellate standard of review which governs this Court's disposition of challenges to factual determinations. A cursory comparison of the factual summaries included in the Majority and dissenting opinions reveals that the Majority has overlooked evidence favorable to the judgment, weighed the evidence, and substituted its conclusion for that of the jury. I would affirm the award of punitive damages.

2. As stated by the Court in *Hibschman Pontiac, Inc. v. Batchelor,* the facts presented there were:

> "The evidence showed that requested repairs were not satisfactorily completed although covered by the warranty and capable of correction. Some of these defects were clearly breaches of warranty. Paint was bubbled, the radio never worked properly, the hood and bumper were twisted and misaligned, the universal joints failed, the transmission linkage was improperly adjusted, the timing chain was defective causing improper tune-ups and the carburetor was defective, among other things. Batchelor took the car to the defendant with a list of defects on numerous occasions and picked up the car when told it was 'all ready to go.' It was reasonable to infer that the defendant's service manager represented repairs to have been made when he knew that the work had not been done and that in reliance on his representations, Batchelor drove the car on trips and had breakdowns. Before purchasing the car Batchelor was given special representations on the excellence of Hibschman's service department, and the jury could find that Batchelor relied on these in buying the car from the defendant. After having brought the car in on numerous occasions, Batchelor was told by Jim Hibschman, 'I would rather you would just leave and not come back. We are going to have to write you off as a bad customer.' And he was told by one of Hibschman's mechanics that, 'If you don't get on them and get this fixed, they will screw you around and you will never get it done.' From these statements the jury could infer that the defendant was attempting to avoid making certain repairs by concealing them during the period of the warranty. Batchelor gave the defendant numerous opportunities to repair the car and the defendant did not do so; instead he tried to convince Batchelor that the problems were not with the car, but rather with Batchelor. We are of the opinion that in this case the jury could have found there was cogent proof to establish malice, fraud, gross negligence and oppressive conduct."

362 N.E.2d at 848.