**ROSE ACRE FARMS, INC.,**
**Defendant-Appellant,**

v.

**Kent C. CONE, Plaintiff-Appellee.**

**No. 1-785A174.**

Court of Appeals of Indiana,
First District.

April 30, 1986.

Rehearing Denied June 4, 1986.

---

Stephen W. Terry, Jr., Brian K. Burke, Elizabeth T. Young, Baker & Daniels, Indianapolis, Corinne R. Finnerty, McConnell, Finnerty & Roche, North Vernon, Kerry L. Thompson, Everitt, Houston & Thompson, Scottsburg, for defendant-appellant.

Mark J. Dove, Rogers & Dove, North Vernon, James R. Kilburn, Railing & Duvall, Scottsburg, for plaintiff-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Defendant-appellant, Rose Acre Farms, Inc. (Rose Acre), appeals from a judgment entered following a jury verdict awarding plaintiff-appellee, Kent C. Cone (Cone), overtime compensation, vacation pay, bonus pay, and punitive damages, all arising out of employment related claims.

We reverse.

## STATEMENT OF THE FACTS

From April 1977 to October 1982, Cone was an employee of Rose Acre, a family-owned corporation in the business of producing and selling chicken eggs. When hired in April of 1977, Cone worked in the construction of chicken houses, including the installation of the cages and equipment within such houses. Cone was promoted in 1980 to the position of House Manager, responsible for the care of the laying hens in the hen houses assigned to him. In 1981, Cone was promoted to the position of Relief Pullet Manager, responsible for the care of the pullets in the houses assigned to him. Cone worked in this capacity until October of 1982 when he left Rose Acre.

During the period of Cone's employment, the terms and conditions of his employment were established by Rose Acre's written employment policy sheets. These policy sheets were changed from time to time by Rose Acre's president, David R. Rust (Rust), and Cone was made aware of other policies and rules during weekly meetings, from contact with supervisory personnel, and from working at Rose Acre on a daily basis. If anyone had a complaint, misunderstanding, or question about his rights or obligations, the policy sheets provided a grievance procedure whereby channels of communication were to be directed to man-

agers or supervisors, and if not satisfied, they were to then see Rust directly about the problem. The policy sheets formed the basis of several of Cone's claims, including dispute as to overtime compensation, vacation pay, and bonus pay.

Regarding overtime compensation, the policy sheets provided that regular working hours were from 7:00 a.m. to 12:00 noon and from 1:00 p.m. to 4:00 p.m., and managers were to arrive one-half hour earlier and finish one-half hour later. Under the policy sheet dated April 20, 1979, everyone working six full days was to receive double the daily rate of pay for the sixth day worked, but this provision was deleted from subsequent policy sheets. However, when Cone performed construction work for Rose Acre, he was paid one-quarter of the daily rate of pay for each two hours of overtime worked pursuant to an unwritten policy, but such overtime had to be scheduled and approved in advance by a supervisor. When Cone worked as a House Manager and a Relief Pullet Manager, he never received overtime compensation nor had he ever obtained prior approval for such pay from his supervisor. There apparently was another unwritten policy that employees, including Cone, were to remain on the Rose Acre premises during the lunch hour and would receive a free or partially subsidized lunch.

Under Cone's claim for vacation pay, the policy sheet required several conditions to be met. These conditions were changed under the policy sheet dated July 21, 1982, the year for which Cone is claiming that vacation pay is due. Rose Acre also offered various bonus incentives to its employees for which it required strict compliance before a bonus would be paid. The bonus relevant to Cone's appeal is the "Cort Acres Progress Bonus" which Cone maintains he earned but was never paid. Additional facts pertaining to vacation pay and the bonus will be developed below.

Finally, in support of his punitive damage claim, Cone alleges several factual matters which he claims amounts to fraudulent and oppressive conduct on the part of

Rose Acre. Cone claims he was required to work numerous hours of overtime, contrary to the stated working hours in the policy sheets, for which he was compensated sporadically at best. Though he never availed himself of grievance procedures, Cone also claims the grievance procedure was a sham because when the procedure was attempted, employees met with adverse ramifications such as being ridiculed in front of the employees' peers; being required to work after regular hours without compensation; having a pay cut indiscriminately by the president, Rust, by as much as $150.00 per week; failing to pay bonuses; and being fired from Rose Acre. Cone also alleges Rust attempted to control his life while away from work such as prohibiting him from taking his wife to a bar. Cone cites to additional instances of oppressive conduct "scattered throughout the Record" such as:

> "[R]efusing to pay Cone for one-half (½) day of work because he had failed to shave one morning; Deducting money from Cone's check for failing to wear a 'chicken feather' pin in his lapel while taking his family to the Brownstown Fair; Deducting money from Cone's wage because someone, unbeknownst to Cone left a pop can in a part of a chicken house seldom seen by any person; Deducting money from Cone's wage because he followed the instructions of Rose Acre Farms' vice president with regard to the storage of what are called 'manure shields'; Deducting money from Cone's check because there were weeds behind the house in which Cone lived that were taller than other weeds and further requiring Cone to cut the weeds at [8:00] o'clock P.M. on Christmas Eve."

Nevertheless, in spite of these claims, Cone continued to work at Rose Acre and never sought redress through proper grievance procedure.

## ISSUES

There are essentially four issues in this appeal.

I.   Whether Rose Acre is obligated to pay Cone overtime compensation.

II.  Whether Rose Acre is obligated to pay Cone vacation pay.

III. Whether the Cort Acres Progress Bonus was replaced by the 10% Return on Investment Bonus.

IV.  Whether the jury's award of punitive damages is supported by clear and convincing evidence.

In reviewing the evidence, we will only consider the evidence and reasonable inferences therefrom which support the verdict, and where the evidence is in conflict and reasonable minds can differ on an issue, we are bound by the jury's findings. *Peterson v. Culver Educ. Found.* (1980), Ind.App., 402 N.E.2d 448. However, where the evidence is without conflict and leads to only one conclusion opposite to the conclusion reached by the trier of fact, the judgment must be reversed as a matter of law. *See Pepinsky v. Monroe County Council* (1984), Ind., 461 N.E.2d 128.

## DISCUSSION AND DECISION

### Issue I. *Overtime Compensation.*[1]

▮ It has long been held in Indiana that before a valid claim for overtime compensation can be awarded, there must be an express or implied agreement to that effect. *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Marable* (1919), 189 Ind. 278, 126 N.E. 849; *State ex rel. Crooke v. Lugar* (1976), 171 Ind.App. 60, 354 N.E.2d 755, *trans. denied; Trojnar v. Bihlman* (1964), 136 Ind.App. 263, 200 N.E.2d 227. It is the employee's burden to prove the existence of such agreement, and it is not sufficient to establish merely that services outside of the ordinary employment were requested by the employer and performed by the employee. *Marable, supra.* The employee must offer further proof that:

"[T]he services requested were of such a character and were rendered under such

circumstances as would lead to the conclusion that a servant performing such services would be reasonably justified in the belief that he would be allowed additional compensation therefor, and that an employer making such request would be reasonably expected to know that additional compensation would be expected. In other words, the character of the work requested and the circumstances attending the request and performance must be shown to be of such a nature as to justify the inference that extra compensation was contemplated by both employer and the employee." (Citations omitted.)

*Id.* at 281–82, 126 N.E. at 850. Under this approach which considers the character of the services rendered:

"[N]o recovery can be allowed where such services were essentially of the same nature as those usually performed under the contract of employment, or where such services were so intimately connected with the duties to be performed under the contract as to indicate that their performance was contemplated as an incident to service in which the employee was engaged."

*Id.* at 281, 26 N.E. at 850. Otherwise, a request for performance of services by an employer does not justify the inference of an offer to pay additional compensation since it is assumed that such services were requested and performed under contract of employment. *Id.*

▮ The course of action which should be taken by an employee in this type of situation was stated in *Helphenstine v. Hartig* (1892), 5 Ind.App. 172, 176, 31 N.E. 845, 846:

"If he did not know what his employers would expect and require of him in this respect, he could have ascertained, and if he was not willing to labor more than eight hours for a day's work it was his duty to have so informed his employers, so they could have considered that ques-

---

1. Rose Acre correctly notes that Cone is employed in agriculture, *see* 29 U.S.C. Sec. 203(f) (1982), and as such Rose Acre is exempt under 29 U.S.C. Sec. 213(b)(12) (1982) from any statutory duty to pay overtime compensation.

tion before entering into the agreement with him. But if he entered upon his work without knowing how many hours he would be required to labor for a day's work, and was not willing to labor more than eight hours, it was his duty, at the end of eight hours' work on the first day, to have then and there informed his employers of his intention, and had a full and complete understanding with them. But if he continued to work more than eight hours each day without objection and without informing said employers that he intended to charge for the extra time, it will be implied that he consented and agreed to their requirements, and he can not recover for the hours worked each day beyond eight hours, as extra time."

The cases which followed held that where an employee failed to protest that he was entitled to additional compensation, it raises the conclusive presumption that the amount received by the employee was accepted in full payment of what was due him. *Grisell v. Noel Brothers Flour, Feed Co.* (1893), 9 Ind.App. 251, 36 N.E. 452. *See Trojnar, supra; Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Baker* (1919), 73 Ind.App. 332, 125 N.E. 233. Where an employee continues and acquiesces in the terms of his employment, he waives any right to claim additional compensation. *Grisell, supra. See Trojnar, supra.*

In his claim for compensatory damages, Cone asked for $26,053.00 in overtime compensation due based on 3,721 overtime hours worked. He calculated his overtime hours by adding up each hour worked before 6:30 a.m. and after 4:30 p.m. plus each lunch hour since he was not permitted to leave Rose Acre during the lunch hour and meetings were periodically held during this time. Under the unwritten overtime policy he claims was in effect until the time he left, Cone claimed one-quarter of his daily rate of pay of $56.00 per day for every two overtime hours worked. The jury returned a verdict in favor of Cone on this issue for the amount of $4,502.40.

Cone tries to establish an agreement for overtime compensation under the following set of facts. When he started working for Rose Acre in 1977, there was an understanding from the policy sheets that he would be required to work an eight hour day with an hour off for lunch. When he was working in construction, he received overtime compensation under an unwritten policy which continued until he left in 1982, and since this figure is based on hours per day as expressed in the policy sheets, there was both an express and implied agreement to pay overtime. However, when Cone did receive overtime compensation, he admitted he was scheduled for such overtime and the pay was approved in advance. Cone never received this form of overtime pay as a House Manager or as a Relief Pullet Manager, and no such pay was ever scheduled or approved when he worked in this capacity. Cone claims he "complained" to his supervisor about no longer being paid overtime, but this complaint was made in 1977 pertaining to the double rate of pay for the sixth day worked, which policy was retracted by written notice in 1979.

Cone simply failed to provide any evidence from which an implied or express agreement between Rose Acre and himself can be substantiated. The character of the services he performed beyond the stated working hours were of the same nature as those usually performed under the employment contract. Cone was paid on a daily basis not an hourly basis. The frail nature of the pullets and eggs were such that Cone, as a manager, was responsible to ensure that the chickens were fed and that the hen houses were cleaned and in proper working order before leaving for the day. Cone never complained that he was not receiving a quarter of the daily rate for every two hours of overtime as allegedly "agreed" either as a construction worker or as a manager. There is no evidence whatsoever that Cone had an agreement with or even mentioned to his employer that he is to be paid for his lunch hour. However disgruntled over the character of

the job and the employment practices of Rose Acre, Cone for years acquiesced in the terms of his employment and never sought to have his overtime scheduled and approved according to the same unwritten overtime policy for which he bases his claim. As such he has also waived his right to claim additional compensation.

We hold that there is no evidence of an express or implied contract which would support a claim for the overtime compensation claimed, and Cone is not entitled to judgment here as a matter of law.

Issue II. *Vacation Pay.*

■ Although Cone left Rose Acre in October 1982, he claims he was entitled to vacation pay for the fiscal year 1982–1983. Under the terms of the policy sheet dated July 21, 1982, vacation pay was allowed as follows:

"VACATIONS

1. All new personnel whose starting date is before December 31st of the previous year, will be eligible for 1 week paid vacation. After June 1st, regular people who have completed the following years of continuous service, in which they have worked at least 250 days each year shall be granted vacation in pay, as shown below, after their anniversary date of employment. All vacations must be taken during June, July and August. Pay for those not taken (over one week only) will be paid the first week of September.

| After 1 year | 1 week |
| After 2 years | 2 weeks |
| After 15 years | 3 weeks |

2. Vacation pay will be paid on the basis of the persons previous calendar year earnings times 2% with a minimum of $100.00."

Rose Acre maintains that this provision is unambiguous and requires three conditions to be met in order for Cone to receive vacation pay for the year: (1) maintain seniority for the year which required working 250 days; (2) continue employment through his anniversary date in April 1983; and (3) continue employment beyond June 1, 1983. In the course of Cone's own testimony, he admitted he did not meet any of these conditions. Nevertheless, the jury returned a verdict in his favor, awarding him $401.00 in vacation pay for the full year.

In support of his claim, Cone cites the following language from *Die & Mold, Inc. v. Western* (1983), Ind.App., 448 N.E.2d 44, 48: "Since vacation pay is additional wages, earned weekly, where only the time of payment is deferred, it necessarily follows that, *absent an agreement to the contrary*, the employee would be entitled to a pro rata share of it to the time of termination." (Our emphasis.) However, crucial to the decision there was that the evidence and findings of the trial court disclosed no specific terms or policy regarding vacation pay. The court further stated: "Had such an agreement or published policy existed it would be enforceable." *Id.* at 47–48. In the case at bar, Rose Acre had a policy published in its policy sheets stating the conditions for payment. Cone met none of them. Cone cannot now claim a pro rata share of his vacation pay as his employment agreement does not contemplate that form of compensation. As the jury's verdict reflects an award of vacation pay for the full year despite the fact that Cone failed to meet the contractual conditions for vacation pay, the verdict must be reversed as a matter of law.

Issue III. *Bonus Agreements; Novation.*

In addition to regular forms of compensation, Rose Acre frequently offered bonus contracts as incentives for its employees. While Cone was the benefactor of several bonus contracts, he claims he complied with the conditions of the bonus known as "Cort Acres Progress Bonus" but was never paid. The bonus certificate provides:

"This certificate certifies that *Kent Cone* is eligible for a $3,000.00 cash bonus on completion of Cort Acres (36 wings) on or before Labor Day 1981.

For eligibility, seniority or present status must be maintained."

Cone claims the project was completed for the purposes intended in November of 1980, some 10 months prior to the deadline date on Labor Day, which was further evidenced by a party held in March of 1981 to

celebrate completion of the project. All workers and equipment were removed from the project some six months prior to the deadline date. Rose Acre counters by claiming the terms of the bonus were not strictly complied with since the ventilation system did not work properly and the landscaping had not been completed. We agree with Cone that when there is conflicting evidence, we are bound by the jury's verdict which awarded him the bonus. *Peterson, supra.* However, there is additional evidence which defeats Cone's claim as a matter of law.

On the Saturday before the deadline date of the Cort Acres Progress Bonus, Rose Acre offered a substitute bonus certificate wherein Cone would receive $3,000.00 when Rose Acre obtained profit levels of a 10% return on its investments. Cone testified that he was never told the return on investment certificate was to replace the Cort Acres certificate, but only that Rust told him that Rose Acres was experiencing financial difficulties at the time. Cone was not required to do anything further to receive the return on investment bonus, nor was he required to maintain seniority. In fact, Cone was paid $3,000.00 under the return on investment bonus in 1983, after he had left the employ of Rose Acre.

■ Back in August of 1980, Cone also agreed in writing to the following conditions regarding the payment of bonuses:

"August 16, 1980

BONUSES

'Anything given in addition to the customary or required amount.'

I, Kent Cone hereby acknowledge and fully understand that bonuses are not required and are given only at the discretion of management and are always subject to change.

To be eligible for a bonus, I understand that I must be present for all scheduled work (every minute) consisting of a minimum of 5 days per week.

/s/ Kent Cone
Dated: 8–30–80"

An employee is normally not entitled to payment of a bonus until after the time stipulated in the bonus, absent evidence establishing a modification or waiver of the bonus conditions. *See Dove v. Rose Acre Farms* (1982), Ind.App., 434 N.E.2d 931; *Montgomery Ward & Co. v. Guignet* (1942), 112 Ind.App. 661, 45 N.E.2d 337. Clearly, Rose Acre modified the terms of the original bonus agreement with the substituted bonus before the due date. Cone apparently did not object or assert any grievance for not being paid under the Cort Acres bonus before instituting this suit.

■ The controlling issue here is that conduct of the parties regarding the substituted bonus amounted to a novation. A novation is a new contract made with the intent to extinguish one already in existence, and it contains four essential elements: (1) an existing and valid contract; (2) all parties must agree to the new contract; (3) the new contract must be valid; (4) the new contract must extinguish the old one. *White Truck Sales of Indianapolis v. Shelby Nat'l. Bank of Shelbyville* (1981), Ind.App., 420 N.E.2d 1266; *Boswell v. Lyon* (1980), Ind.App., 401 N.E.2d 735, *trans. denied;* 22 I.L.E. *Novation* (1959). In the case at bar, there is no dispute that the Cort Acres Progress Bonus was an existing and valid contract. A closer issue is whether the parties agreed to the new, substituted bonus. We note that the substituted bonus did not have any express language indicating an intent to create a novation, or that it was intended as a substituted bonus which were critical factors refuting a novation in *White Truck Sales of Indianapolis, supra,* and *Boswell, supra.* However, express words need not always be present to indicate the assent to and acceptance of the terms of a novation; the intent may be implied from the facts and circumstances surrounding the transaction and the conduct of the parties thereafter. *Armour & Co. v. Anderson* (1943), 114 Ind.App. 485, 51 N.E.2d 496; 22 I.L.E. *Novation* (1959). Here, this is not a novation involving third parties as in *White*

*Truck Sales of Indianapolis, supra,* and *Boswell, supra.* Cone never voiced any formal complaint about not being paid under the original bonus until he instituted this suit. He accepted the new bonus at a time when he was told Rose Acre was experiencing financial difficulties. Unlike other bonus agreements he had with Rose Acre, the new bonus required no extra duties to be performed on his part, nor was he even required to maintain seniority. He had also signed an agreement allowing bonuses which, at the discretion of management, were subject to change. Finally, he accepted payment under the new bonus even after he terminated his employment. The circumstances surrounding the substituted bonus and the conduct of Cone thereafter evidence an intent to assent to the terms of the new bonus.

■ Further intent can be inferred from the circumstances supporting the third and fourth elements of a novation. The only thing which validated the substituted bonus and extinguished the old one is that by extinguishing the old debt, it constitutes consideration for the new obligation. 22 I.L.E. *Novation* (1959). Otherwise, the substituted bonus, standing alone, would merely be a new promise of additional compensation unsupported by consideration which would not be enforceable since it was made after Cone claimed he had already rendered his promised performance. *Dove, supra; Spickelmier Indus., Inc. v. Passander* (1977), 172 Ind.App. 49, 359 N.E.2d 563. For these reasons, Cone's own inaction and assent to nonpayment of the Cort Acres bonus when due and acceptance of the substituted bonus created a novation, and since the new contract has been paid, he may not now claim under the original bonus which was extinguished.

Issue IV. *Punitive Damages.*

■ In Indiana, the law is clear that punitive damages ordinarily are not recoverable in contract actions. *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845; *Vernon Fire & Casu-*

*alty Ins. Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173; *Harper v. Goodin* (1980), Ind.App., 409 N.E.2d 1129; *First Fed. Sav. and Loan Ass'n. of Indianapolis v. Mudgett* (1979), Ind.App., 397 N.E.2d 1002. The damages recoverable for a breach of contract action are compensatory in nature and limited to damages within the contemplation of the parties when the contract was made. *Vernon Fire & Casualty Ins. Co., supra.* As the promisee will be compensated for all damages proximately caused by a promisor's breach, the promisor's motive for breaching the contract is irrelevant. *Id.* Nor it is relevant that the promisor's breach may indicate substandard business practice; "the promisee may also enjoy a limited sense of requital in taking his business elsewhere in the future, but he is not entitled to mulct the promisor in punitive damages." *Id.* at 608, 349 N.E.2d at 180. The promisor also has the legitimate right to disagree, in good faith, as to the amount of recovery under the contract. *Id; First Fed. Sav. & Loan Ass'n., supra.*

Exceptions have developed where, in addition to compensatory damages, courts have allowed recovery of punitive damages in exceptional cases. However, because punitive damages are penal in nature, a standard of proof more akin to criminal trials used. *Travelers Indem. Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349. In *Travelers Indem. Co.,* the supreme court developed the clear and convincing standard for application in the trial of punitive damage claims. This strict standard was again reiterated and applied in *Orkin Exterminating Co. v. Traina* (1986), Ind., 486 N.E.2d 1019. These cases establish that there is no absolute right to punitive damages, and they are generally disfavored not only because they are a "windfall" to the plaintiff, but also because they allow punishment without the safeguards of criminal procedure. *Miller Pipeline Corp. v. Broeker* (1984), Ind.App., 460 N.E.2d 177.

■ Over the years, courts have wrestled with the semantics of what conduct would justify an award of punitive

damages. Essentially, two exceptions have evolved. First, where the breach of contract is accompanied by conduct which also, independently, establishes the elements of a common law tort such as fraud, punitive damages may be awarded for the tort. *Hibschman Pointiac, Inc., supra; Vernon Fire & Casualty Ins. Co., supra; First Fed. Sav. & Loan Ass'n., supra; Harper, supra.* Second, punitive damages may be awarded where a serious wrong, tortious in nature, has been committed in an instance in which the public interest would be served by the deterrent effect punitive damages would have on the conduct of the wrongdoer and parties similarly situated. *Hibschman Pontiac, Inc., supra; Vernon Fire & Casualty Ins. Co., supra; First Fed. Sav. & Loan Ass'n., supra; Harper, supra.* In other words, punitive damages may be awarded in addition to compensatory damages when it is proven that the elements of fraud, malice, gross negligence or oppression mingle in the controversy. *Hibschman Pontiac, Inc., supra; Vernon Fire & Casualty Ins., supra.*

■ However, in elaborating on the above exceptions and the clear and convincing standard of proof, the court in *Travelers Indem. Co., supra,* at 362, stated:

"[P]unitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing."

As held in *Orkin Exterminating Co., supra,* a defendant faced with a claim for punitive damages "is cloaked with the presumption that his actions, though tortious, were nevertheless noniniquitous human failings, i.e. that he is *not guilty of the quasi-crime alleged. Id.* at 1023. To overcome this presumption, the ultimate determination is controlled by the malfeasor's state of mind, and punitive damages may

be awarded upon a showing of willful and wanton misconduct. *Id.* The court further stated that "the perverseness that public policy will permit the courts to punish is conscious and intentional misconduct which, under the existing conditions, the actor knows will probably result in injury." *Id.* at 1023. From these rulings it is clear that there must be a conscious, intentional, willful or wanton state of mind underlying the alleged tortious conduct.

■ Cone here alleges several factors which he claims amount to an excessive use of authority on the part of Rose Acre and its president, Rust, which was conducted in the spirit of wanton disregard of his rights and were thus fraudulent and oppressive. These allegations are nothing more than standard employee gripes common in the labor market. These were unrelated to the breach of contract. Punitive damages may not be awarded in the absence of compensatory damages. *Liberty Mut. Ins. Co. v. Parkinson* (1985), Ind.App., 487 N.E.2d 162; *Newton v. Yates* (1976), 170 Ind.App. 486, 353 N.E.2d 485, *trans. denied.* As we have held above, Cone failed to prove he was entitled to any of the claims he had for compensatory damages. All the other factors he claims to amount to oppressive conduct are merely extraneous facts which are not even a basis for compensatory damages.

Even if Cone were able to make a valid claim for compensatory damages, Cone has failed to prove by clear and convincing evidence any tortious state of mind on the part of Rose Acre or its agents mingled in the alleged breach of his employment contract, nor has he proved that punitive damages here would be in the public interest. As noted in *Vernon Fire & Casualty Ins. Co., supra,* where a party exercises its legitimate right to disagree as to the amount of recovery, it may directly result in the intentional infliction of temporal damage which the opposing party will undoubtedly consider to be oppressive. If Cone did not like the business practices of Rose Acre, many of which he availed himself of and received benefit from, no one

forced him to stay in the employ of Rose Acre. All of Cone's assertions are merely belated, retroactive complaints after he had quit his job. During his employment, Cone never sought redress under the formal grievance procedure. Cone asks us to strictly adhere to the contractual provisions in the policy sheets and bonus contracts for some of his claims, and asks us to disregard them for his other claims.

For the above reasons, this cause is reversed, and the trial judge is ordered to enter judgment for Rose Acre.

Judgment reversed.

YOUNG, P.J. (by designation), and RATLIFF, J., concur.