George J. NATE, Jr., Plaintiff-Appellant,

v.

Fred GALLOWAY and Gail Galloway, Defendants-Appellees.

No. 3-479A91.

Court of Appeals of Indiana, Third District.

Aug. 27, 1980.

Rehearing Denied Oct. 3, 1980.

William L. LaBre, Edwardsburg, Mich., for plaintiff-appellant.

Marcia K. Sowles, South Bend, for defendants-appellees.

HOFFMAN, Judge.

This appeal concerns a landlord-tenant dispute in which the trial court found the landlord had breached the covenant of quiet enjoyment and awarded the defendants-tenants $234.67 in compensatory damages, $3,500 in punitive damages and cost of the action. The following statement of facts is taken primarily from the memorandum accompanying the order of the trial court.

On June 27, 1977, defendants Fred and Gail Galloway entered into a written lease with Oxford Development Corporation (Oxford) for an apartment located at 406 South 27th Street, South Bend, Indiana. That lease provided for a monthly rental of $110, possession by the Galloways for one year, and also contained several other provisions. At or near the time of taking possession of the apartment in July 1977, the Galloways provided Oxford with a list of necessary repairs to the apartment, pursuant to the landlord's request.

The incidents giving rise to this action began on August 4, 1977, the day that plaintiff George Nate purchased the Galloways' apartment and the adjoining apartment. On that date, Nate came to the Galloways' apartment, introduced himself, informed them that he was their new landlord and that their lease with Oxford was void. He also stated that their rent would be increased to $150 per month on September 1, and a new lease would be signed by Nate and the Galloways. The rental increase announced by Nate would have exceeded thirty-six per cent of the monthly rental obligation; the lease between the Galloways and Oxford allowed for an increase of fifteen per cent with thirty days' notice.

Nate conducted no inspection of the apartment on August 4, but returned a week or two later for an inspection. He found some problems with the apartment. Sometime toward the end of August, the Galloways informed Nate that their stove would not close properly.

On August 29, 1977 Nate appeared at the Galloway apartment and demanded that they sign a new lease. The Galloways demurred and requested time to consult their attorney. Nate gave them twenty-four hours. Upon Nate's return the next night, the Galloways informed Nate that they had contacted their attorney and had been advised that the lease with Oxford was valid. Nate then presented the Galloways with a document entitled "Legal Notice to Quit." That document read in part:

"You are Hereby Notified, To deliver to me, at the expiration of *4 days* days [sic] from the time of receiving this notice, the possession of the following premises . . now held of me by you as tenant, *original notice was served to you on August 4, 1977 by me and you have 4 days remaining to vacate.*"

In response to Galloways' statement that the lease was valid, Nate replied that a landlord "can always find some small thing" to justify eviction of a tenant.

In a telephone conversation on August 31, 1977 Nate was informed by the Galloways' attorney that the lease between the Galloways and Oxford was valid. On the same date Nate informed the Galloways by telephone that he would accept no further rent from them. On September 1, 1977 Nate caused to be filed Small Claims Cause No. 77–SC–3766 in the Small Claims Division of the St. Joseph Superior Court. That Notice of Claim form, which constitutes the complaint in this cause, was styled by Nate in the section provided litigants for a brief statement of the claim: "Complaint for immediate possession for breach of written lease." No description of the breach was offered. Subsequent to the filing of the action, Nate informed the Galloways that the asserted breach was nonpayment of rent. Service of process was made by the sheriff upon the Galloways on September 2, 1977.

On September 7, 1977 Nate entered the Galloways' apartment and removed the stove, ostensibly to perform repairs. Nate left the Galloways with no alternative means to heat their food. He took a part of the stove to an appliance store and requested that it order the necessary parts.

Approximately one week after he removed the stove, Nate was informed by the store that the part he had brought in was not adequate for identification, and that he would either have to provide more parts or bring in the entire stove. Although he concededly had the facilities to take the entire stove to the repair store, he claims he was too busy to do so. Accordingly, that stove has never been repaired. On October 17, 1977, forty days after Nate's initial displacement of the Galloways' stove, Nate installed another stove in the apartment.

In the meantime, Nate informed the Galloways that if they were not out of the apartment by the 15th of September, the eviction proceedings would continue. The Galloways attempted to pay their rent by mailing Nate a check for $110 for their September rent by certified mail; the return receipt indicates that Nate received the check on September 15, 1977. Under date of September 16, Nate responded thusly: "We are returning your rent check # 497 as we intend to proceed with our eviction proceedings. We will not accept any further rent payments whatsoever."

Several times after the initial contact on August 4, Nate contacted the Galloways about signing a new lease.

On September 19, 1977 Nate again came upon the premises to investigate loose tiles he had noticed in the apartment's bathroom. As part of that investigation, Nate removed all of the tiles from the wall in the tub area, as well as the shower attachment. He found no structural damage but did find that the plasterboard was crumbling, apparently from water damage. He also decided that new plywood would be necessary on the floor. He replaced neither the tile nor the shower attachment. Nate testified at trial that necessary major repairs would have required removal of the stool and would have taken a full month to accomplish. He did not testify as to when, if ever, he intended to perform those repairs.

The tiles he then removed have never been replaced. In early December 1977 (more than two months after the bathroom was dismantled), in response to Nate's suggestion that he could repair the bathroom if given a week to do so, the Galloways made arrangements to move into a relative's home for a week to permit those repairs to be made. Nate then responded that, because of the weather, he could not do the repairs. He suggested that he might be able to do the repairs in the spring. Nate did offer to "let" the Galloways out of their lease.

On September 23, 1977 the Galloways filed their answer and counterclaim in this cause, and removed the same to Division I of the Superior Court on the ground that they believed in good faith that their counterclaim for intentional infliction of mental and emotional distress and breach of the lease's covenant of quiet enjoyment exceeded the jurisdiction of the small claims division.[1] Pursuant to Rule 5 of the local court rules, the cause was removed and redocketed. The counterclaim prayed for compensatory damages and punitive damages.

Nate subsequently retained counsel and learned how to increase the Galloways' rent pursuant to the provisions of the lease. On November 4, 1977 he increased the rent fifteen per cent to $126 per month.

In analyzing these facts, the trial court specifically ruled:

"In summary, George Nate took title to the Galloways' apartment on August 4, 1977, immediately advised the Galloways that their lease was void, and ordered them to sign a new lease at a higher rate of rent. When they refused, he ordered them to leave; he gave them four days' notice and claimed to have given them prior notice some twenty-six days earlier when he erroneously advised them that the lease was invalid. The following day, he advised them that he would not accept September's rent. The day following that, he filed a small claims action demanding possession on the basis of breach of the written lease which he had previously declared void; that declaration had apparently formed the basis of the 'notices' on August 4 and August 30. Because Nate did not discover the asserted damage to the bathroom until the tile was removed on September 19, 1977, the Court can only surmise that the 'breach' asserted in the September 1 filing was the non-payment of the rent Nate had announced he would not accept. Nate then proceeded to remove the stove, the bathroom tile and the shower attachment, which actions, whether or not by design, amounted to a partial dismantling of the apartment. He eventually raised the

---

1. The trial court denied recovery on the claim for intentional infliction of mental and emotion-

al distress and that decision has not been appealed.

rent on the apartment to the fullest extent permitted by the lease. Throughout all of these actions, the bulk of which occurred over the span of less than fifty days, Nate believed that he was dealing with a pregnant tenant. Throughout all of these actions, Nate consistently 'offered' to let the Galloways move out or sign a new lease providing for greater rent.

"On the basis of the foregoing, the Court finds that plaintiff George Nate has engaged in a malicious and oppressive course of conduct designed to produce increased revenue to him from the apartment at 406 South 27th Street, and that he has done so with reckless disregard for the rights of the Galloways."

In bringing this appeal, Nate alleges five errors which have been consolidated as follows:

(1) whether the finding of a breach of the covenant of quiet enjoyment is not supported by sufficient evidence and is contrary to the law;

(2) whether the award of compensatory damages is contrary to the law; and

(3) whether the award of punitive damages is contrary to the law and not supported by sufficient evidence.

■ In challenging the finding of a breach of the covenant of quiet enjoyment, the landlord, Nate, contends that either a constructive or an actual eviction is a prerequisite to the finding of a breach. In the present case, the tenants continued to live in the apartment throughout the term of the lease and did not vacate, abandon or surrender the premises at any time. In reviewing the case law on this issue, many cases which find a breach of the covenant of quiet enjoyment do require an eviction. However, in each of these cases, the tenant was requesting a release from the lease agreement and the future rental obligations. Therefore, it is only logical that an eviction be required in those situations. In the present case, however, the tenants are not requesting a termination of the lease. They have continued to pay the rent and occupy the premises. Thus, logic dictates that an eviction is not a prerequisite for a recovery of damages based on the landlord's breach.[2]

Beginning with *Avery et al. v. Dougherty* (1885), 102 Ind. 443, 2 N.E. 123, the Supreme Court has discussed the covenant of quiet enjoyment. In *Avery*, a series of promissory notes were executed in consideration of a lease agreement. The payments on the notes were the equivalent of a rental obligation. For damages, plaintiffs alleged a failure of consideration for the notes and requested a return of money paid on the notes. The court ruled that *to suspend or terminate a rental obligation*, a total or partial eviction must be proved.

"An interruption of a tenant by the landlord is not necessarily an eviction of him. And *nothing less than an eviction will suspend rent [either] in whole or in part.*" [Emphasis added]

2 N.E. at 126.

Thus, in a case which involves an alteration or termination of the rental payments under the lease agreement, an eviction is necessary.

The appellant relies heavily on the case of *Bowers et al. v. Sells et al.* (1954), 125 Ind.App. 324, 123 N.E.2d 194, 125 N.E.2d 175, to support his contention that an eviction is necessary for any finding of breach of the covenant. In that case, the tenant was wrongfully evicted and recovered damages for the value of the lost leasehold interest and lost profits. Again, this was a case in which the tenant was no longer in possession of the premises and was seeking to recover damages for the wrongful termination of the lease agreement. Therefore, *Bowers* is distinguishable from the case now before this Court.

2. We note that the trial court found "the evidence might arguably support a finding that Nate's breach of the covenant of quiet enjoyment constituted a constructive eviction and that the plaintiffs should be entitled to a return of all rents paid." However, the plaintiffs have not requested this relief and therefore, the issue of constructive eviction is not before this Court on appeal and will not be addressed in this opinion.

In *Kostas et al. v. Kimbrough, etc.* (1965), 137 Ind.App. 89, 205 N.E.2d 170, the landlord engaged in a course of harassing conduct by interfering with the air conditioner and drain pipes on the leased premises. Damages were awarded to the tenant for the landlord's violation of a temporary restraining order. The tenants' action was based on "courses of conduct which interfered with their enjoyment of the premises" and no eviction was required by the court for the tenant to recover. This more recent case illustrates the development in this area of the law which no longer requires an eviction as an element of the breach.

▬ In summary, then, the cases show that when a wrongful eviction has occurred, the tenant may clearly sue for damages based on an improper termination of the lease and his lost interest therein. In situations where no eviction has occurred, it appears that the tenant may still recover damages based on the landlord's interference with the quiet enjoyment of the premises. This position was suggested in 49 Am.Jur.2d, *Landlord and Tenant*, § 333.

> "A possible view is that the rule requiring an eviction is limited to cases where the tenant is asserting that he is not liable for the payment of the stipulated rental, and that the rule has no application to actions where the tenant asserts a claim for damages for a breach of the covenant for quiet enjoyment even where such claim for damages is asserted by way of setoff, recoupment, or counterclaim in an action for rent."

This interpretation permits a just application of the law to all parties. It is not fair or logical to allow the timid tenant, who easily succumbs to the landlord's intimidation and vacates the premises, to recover damages, and yet deny damages to the stalwart tenant who is aware of his legal rights and refuses to be intimidated or driven from his home.

▬ The second issue presented for our review is whether the award of compensatory damages is contrary to the law. The appellant bases this argument on the assumption that no breach of the lease occurred and the trial court improperly employed its equitable powers. Because this Court has found that a breach did occur, the appellant's argument becomes irrelevant. The landlord then asserts that the tenants were not evicted and therefore, suffered no damage for which they should be compensated. Again, the appellant's argument must fail since this Court has determined that no eviction is required for a breach to occur which results in an award of damages. The defendants' injuries were clearly established by the removal of the stove and dismantling of the bathroom in the apartment.

▬▬ As a final assignment of error, the plaintiff challenges the award of punitive damages. This Court will reverse such an award only when the amount assessed appears to be so outrageous as to impress the Court at first blush with its enormity. An award is excessive when it is so great that it indicates prejudice, partiality, corruption or other improper motive. *Bemis Co., Inc. v. Rubush* (1980), Ind.App., 401 N.E.2d 48. Punitive damages are appropriate in certain cases as discussed in *Hibschman Pontiac v. Batchelor* (1977), 266 Ind. 310, at 314, 362 N.E.2d 845, at 847–848:

> " . . . Where the conduct of a party, in breaching his contract, independently establishes the elements of a common law tort, punitive damages may be awarded for the tort.
>
> "Punitive damages may be awarded in addition to compensatory damages 'whenever the elements of fraud, malice, gross negligence or oppression *mingle* in the controversy.' (Original emphasis) *Vernon Fire & Casualty Ins. Co. v. Sharp, supra*, Ind., 349 N.E.2d 173, 180, quoting *Taber v. Hutson* (1854), 5 Ind. 322.
>
> "Further, where a separate tort accompanies the breach or the elements of tort mingle with the breach, it must appear that the public interest will be served by the deterrent effect of the punitive damages. *Vernon Fire & Casualty Ins. Co. v. Sharp, supra.*"

In the present case, the trial court found that Nate's conduct was interlaced with the "elements of tort." His behavior was char-

acterized as demonstrating fraud, malice, gross negligence and oppressive conduct. Furthermore, the trial court determined that the public interest would be served by an award of punitive damages. The integrity of residential leases is of concern to the courts of this state and public policy opposes the oppressive acts of landlords who seek to undermine valid lease agreements.

In addition, the tenant here could have brought a separate tort action against the landlord. If a landlord interferes with a tenant's use and possession, the tenant may maintain an action in tort to recover resulting damages. *Ind. State Highway Comm. v. Pappas* (1976), 169 Ind.App. 611, 349 N.E.2d 808. See also *Van Bibber v. Norris* (1980), Ind.App., 404 N.E.2d 1365 and *Talbot v. Citizens National Bank of Evansville* (1968), 389 F.2d 207. Therefore, an award of punitive damages is permissible in this case.

Attention must now turn to the amount of punitive damages awarded. The purpose of such award is to punish the wrongdoer and to deter others from engaging in similar conduct in the future. *Indiana & Michigan Elec. Co. v. Stevenson* (1977), Ind.App., 363 N.E.2d 1254. There is no rule that the amount of punitive damages must be within a certain ratio to compensatory damages. *Hibschman Pontiac, supra.* Two factors must be considered in assessing punitive damages.

" . . . [I]t appears to this court that there are two primary factors which should properly be considered in reviewing an award of punitive damages. First, the nature of the tort, and the extent of the actual damages sustained should be considered. Second, the economic wealth of the defendant should be considered." *Indiana & Michigan Elec. Co. v. Stevenson, supra,* 363 N.E.2d at 1262–1263.

In that case compensatory damages were $120 and $300 and punitive damages were $60,000 and $50,000, respectively. In the present case, the landlord, Nate, assigns as error on appeal the failure of the trial court to consider evidence of his economic wealth. This error was not raised by Nate before the trial court in either his motion to cor-

rect errors or his memorandum of facts and law. Nonetheless, an examination of the record reveals that Nate himself testified that he owned three apartment buildings and had been a landlord for sixteen years. This evidence is sufficient to allow the trial court to make a proper finding. Therefore, the award of punitive damages is upheld.

The judgment of the trial court is affirmed.

Affirmed.

GARRARD, P. J., and STATON, J., concur.