The DOW CHEMICAL COMPANY,
Appellant (Defendant Below)

v.

ST. VINCENT HOSPITAL AND HEALTH CARE CENTER, INC. and 8402 Corporation (Plaintiffs Below) and Wiss, Janney, Elstner & Associates (A Defendant Below), Appellees.

No. 41A01–8810–CV–341.

Court of Appeals of Indiana,
First District.

April 23, 1990.

Stephen L. Huddleston, Huddleston Law Office, Franklin, Lee B. McTurnan, Wayne C. Turner, McTurnan & Turner, Indianapolis, Warren S. Radler, Ralph C. Hardesty, Rivkin Radler Dunne & Bayh, Chicago, Ill., for appellant.

Tom G. Jones, Jones, Loveall and Johnson, Franklin, James M. Porter, John E. Lynch, Jr., Bradley J. Bickett, Jill G. Okun, Squire, Sanders & Dempsey, Cleveland, Ohio, Rex P. Killian, Steven H. Pratt, Hall, Render, Killian Heath & Lyman, Indianapolis, for appellees.

ROBERTSON, Judge.

The defendant-appellant Dow Chemical Company (Dow) is appealing from a jury verdict in favor of the plaintiff-appellees St. Vincent Hospital and Health Care Center, Inc. (St. Vincent) and 8402 Corporation (8402). Wiss, Janney, Elstner, & Associates (WJE) were defendants at trial, but are not participating in this appeal. The amount of the jury verdict was for $1,690,-895 in compensatory damages and $5,000,-000 in punitive damages.

A synopsis of the facts favorable to the judgment shows that Dow manufactured a product with the trade name of Sarabond. Sarabond was an additive to mortar and possessed the quality of creating extraordinary bonding between bricks. This strong bond allowed the prefabrication of brick panels which would then be incorporated into the walls of a building.

In October, 1972, 8402 commenced construction of a professional building on real estate owned by St. Vincent. Huber, Hunt & Nichols (HH & N) were the general contractors and construction managers for the building and Pearce and Pearce (Pearce) was the architect. In designing the building Pearce used prefabricated brick panels and specified the use of Sarabond in the mortar. These panels were attached to the building with metal clips. The building was completed in September, 1973.

In March, 1976, several pieces of the brickwork fell from the building. The building manager sought assistance from HH & N in finding the cause for the falling brick. Both HH & N and Pearce conducted investigations into the problem. Subsequently, 8402 hired WJE, an independent consulting firm, to investigate the falling brick.

In the later part of 1976, HH & N agreed to replace the brick panels for half price in exchange for a waiver and release from 8402. Thorlief Larsen, the original masonry subcontractor, paid $11,000 to 8402 in exchange for a covenant not to sue. Thorlief Larsen then entered into a release agreement with Dow. Ultimately Pearce entered into a multi-party release agreement (hereinafter referred to as the release) in which 8402 released Pearce and HH & N, and in which HH & N and Pearce released each other.

There was evidence introduced at trial which showed that in 1970 Dow began receiving reports that there was excessive corrosion in structures which used Sarabond. At a meeting in April, 1971, a masonry engineer showed Sarabond masonry specimens to Dow representatives Grenley and Dirske which contained a high amount of corrosion to metal pencil rods. Dow began in-house research on the problem and ultimately concluded that Sarabond made no contribution to the rusting process. In May, 1971, Dow researcher Cooper reported that based upon his observations of test specimens, Sarabond mortar caused corrosion on mild steel more than a normal cement mortar. His research with numerous rust inhibitors also indicated that they had no effect on Sarabond. However, Grenley was advising engineers, and others, that Sarabond caused no corrosion problems.

Another Dow chemist, Frenier, conducted extensive research for a year and one half and concluded in November, 1972, that Sarabond mortar was considerably more corrosive to embedded steel than a normal mortar. That report was circulated within the Dow organization but was treated as confidential. Henry Kirchner, who was a field structural engineer with Dow's Sarabond sales subsidiary, was working to get Sarabond used in 8402's building and at the time did not reveal the content of the report to Pearce, or anyone else involved in the construction of the 8402 building. The Frenier report was not made public even though it was becoming more apparent to Dow that Sarabond caused excessive corrosion to the metal connections which held the brick panels to a building.

At the time the 8402 building was being designed Dow changed its Sarabond literature to state that corrosion resistant tie and anchors should be used. Over time it became apparent to Dow that a number of structures over the country which had used Sarabond in the mortar were experiencing falling brick as a result of the corrosive qualities of Sarabond, and as late as 1977, Dow made no warnings relating to the use of Sarabond.

In 1976, when the cracked masonry panels and falling brick became a problem with the 8402 building, HH & N, Pearce, Thorlief, two other engineering firms and a testing laboratory, looked into the problem, with each blaming a different cause for the rusting. Dow's Grenley also inspected the building and suggested that faulty clip design and the failure to use galvanized metal clips were at fault. He was silent about the excessive rusting qualities of Sarabond. At a meeting the day after Dow's inspection, it was the consensus that Sarabond was not at fault. Grenley did report to his Dow superiors that it was probable that, among other things, Sarabond was the fault. Grenley did manage to direct atten-

tion of the Sarabond fault away from those trying to correct the deficiencies in the masonry panels used in the 8402 building.

At this point WJE was hired to make an independent investigation. A preliminary report made by WJE suggested, among other causes, that Sarabond may have been at fault; however, a final report awaited further test results from another laboratory. This test revealed excessive salt in the mortar and Dow was consulted about whether the salts could have come from the Sarabond. Dow, through Grenley, did not reveal what Dow knew about Sarabond and its causing excessive corrosion. WJE never specifically identified Sarabond as the rust causing agent.

Additional facts as they relate to specific issues will be stated as needed.

Eventually 8402 and St. Vincent commenced their cause of action against Dow. The cause went to trial on four general theories: negligence, strict liability, implied warranty, and fraud. At the very heart of the lawsuit was the question of whether Dow knew, and how much it knew, of the accelerated rusting characteristic of Sarabond.

Dow raises five issues, several of which contain numerous sub-parts.

## I.

[8402's] 1977 general release of Pearce released Dow: Judgment should have been entered for Dow and the court thereafter gave erroneous instructions on joint tortfeasor release and "voidability" based upon undefined "mistake" of fact. ·

Dow's arguments on this issue are in three general areas. Dow and Pearce are joint tortfeasors, 8402 was precluded from avoiding the release by mutual mistake because the release was not properly rescinded, and, the mutual mistake instruction and the evidence were deficient.

■ Initially, we note that whether a joint tortfeasor has been released is an appropriate question for the jury. *Landers v. McComb Window and Door Co.* (1969), 145 Ind.App. 38, 248 N.E.2d 358.

Dow places reliance upon the venerable case of *Cleveland, C.C. & St. L. Ry. Co. v. Hilligoss* (1908), 171 Ind. 417, 86 N.E. 485, for the holding that, among other things, the release of one joint and several tortfeasor releases all, that the validity of the cause of action does not affect the release, and that separate and independent acts of joint tortfeasors which unite to cause a single injury are subject to release by joint tortfeasors.

8402 argues that Pearce was not responsible for the loss because of the use of Sarabond and, as a result, there was no joint liability.

■ Where the jury can conclude that one tortfeasor was not responsible for the injury there is no joint liability. *See Gen. Accident, Fire & Life Assur. Co. v. Tibbs* (1936) 102 Ind.App. 262, 2 N.E.2d 229.

■ There was evidence before the jury which demonstrated that there was no fault with Pearce's design work and supervision of the construction except for the use of Sarabond. Pearce used Sarabond in reliance upon its belief that Sarabond was a suitable mortar additive. There is also evidence from which the jury could have found that Pearce did not act in concert with Dow in producing the injury or, in the alternative, if Pearce was negligent it was solely because Dow purposely suppressed information relating to Sarabond causing excessive or accelerated rusting of the metal clips.

To the extent Dow's argument urges us to accept facts which the jury has rejected, we would observe on this issue, as well as the remainder of the issues, that we can only consider evidence favorable to the verdict and that we cannot weigh the evidence or judge the credibility of the witnesses. *Abels v. Monroe County Educ. Ass'n* (1986), Ind.App., 489 N.E.2d 533. Where the verdict is a general one, as in this case, it will be affirmed on any reasonable grounds supported by the record. *Picadilly, Inc. v. Colvin* (1988), Ind., 519 N.E.2d 1217.

There was sufficient evidence before the jury from which it could be found that Pearce was not negligent and that Pearce did not act in concert with Dow.

As a sub-part of this issue Dow objected to the following instructions which were given:

[36.] When the acts of two or more persons through cooperation or in concern (sic) accomplish a particular wrong, joint liability is created. Joint liability may also be created when independent acts from two or more persons combine to produce a single injury. When a plaintiff releases one who is jointly liable with others, absent fraud or mistake, the plaintiffs' act releases all who are jointly liable.

[37.] Thus, if you find that Pearce and Dow each committed a tort against plaintiffs, you must determine if Pearce and Dow cooperated or acted in concert or if they committed independent acts which combined to produce a single injury. If you find that Pearce Corporation did not engage in tortious misconduct against plaintiffs, or that Pearce and Dow did not cooperate, act in concern (sic) or commit independent acts resulting in single injury, you should find that Pearce and Dow are not joint tortfeasors and that Dow is not released from liability.

[38.] If you find from a preponderance of the evidence that when plaintiff and Pearce signed the general release in 1977, Pearce had an appearance of some liability for the problems with the masonry panels, or actually contributed to those problems in any degree, then Pearce is a joint tortfeasor within the meaning of the law, and you should return your verdict in favor of Dow, unless you find the plaintiff has proven a mutual mistake of fact.

Dow's objections, primarily directed at instructions 36 and 37, are that they required a finding of actual liability, that the terms "fraud" and "mutual mistake" are not defined, and that the use of the word "fraud" in instruction 36 as it pertains to invalidating the release was improper. These objections speak to the failure of the instructions to correctly and completely state the law. *See Jones v. City of Logansport* (1982), Ind.App., 436 N.E.2d 1138, 1145.

When the instructions are read as a whole, we are of the opinion that they adequately state the law. Instruction 38 incorporates the phrase "appearance of liability" which nullifies the requirement of actual liability. Mutual mistake, as used in the instructions, is not such a technical term that requires a special definition. If Dow desired a fuller statement of the law, or more elaborate definitions of certain terms, it should have tendered such instructions. *Mireles v. State* (1973), 261 Ind. 64, 300 N.E.2d 350. Neither do we find that the instructions are incorrect statements of the law.

II.

The court erroneously allowed the jury to consider three instructions on implied warranty even though [8402] were not buyers and Dow had no contract with [8402] or participation in the sale.

██ Dow first argues that a buyer/seller relationship between Dow and 8402 does not exist and that the Indiana Uniform Commercial Code (I.C. 26–1–2–103(a)) requires that relationship before an implied warranty can exist. Hence, Dow contends that no privity exists between themselves and 8402.

The jury rendered a general verdict, which we will sustain if the evidence is sufficient to sustain any theory of liability. *Picadilly, Inc. v. Colvin* (1988); Ind., 519 N.E.2d 1217. Here, the implied warranty theory was not the exclusive theory of liability because there were negligence and strict liability counts upon which the jury could have found for 8402. The prejudicial impact of this issue is severely diminished.

In any event, there was evidence from which the jury could have found that Dow's involvement in making the Sarabond sale for use in the 8402 building was sufficient to constitute significant participation, an exception to the privity rule. *See Richards*

*v. Goerg Boat & Motors* (1979), 179 Ind. App. 102, 384 N.E.2d 1084.

This issue does not demand reversal.

### III.

The trial court committed reversible error in refusing to inform the jury that only one fraud claim remained in the case.

■ Dow filed a motion for judgment on the evidence which the trial court granted to the extent that 8402's claim based upon fraud in the sale of Sarabond in 1972 was dismissed. 8402's claim of fraud against Dow based upon Dow's conduct in 1976, which was based upon Dow's intentional and willful conduct diverting attention away from Sarabond as a cause of the failure of the brick panels, remained as a question for the jury.

The jury had been given preliminary instructions on both counts of fraud.

Dow tendered an instruction which would have told the jury of the dismissal; however, the trial court refused the instruction. Dow contends that this was reversible error.

As a general proposition we would observe that it is appropriate to advise the jury of the dismissal, although another procedure has been held adequate. A similar situation to this issue arose in the case of *Parke County v. Ropak, Inc.* (1988), Ind. App., 526 N.E.2d 732, wherein the jury was not instructed of the dismissal of some of the counts of the plaintiff's complaint. It was held that as long as the jury was adequately and correctly informed by way of final instructions of the theory of liability upon which it was to decide the case, there was no error. 526 N.E.2d at 742.

Since we find in the next issue that the jury was adequately and correctly instructed on the remaining fraud question, no reversible error exists.

### IV.

The trial court erroneously left a free-floating, "fraudulent concealment" instruction that the jury might have regarded as some independent post-sale tort or as the undefined "fraud" making the release invalid.

Instruction 35 reads:

"To establish fraudulent concealment, the plaintiff must prove by a preponderance of the evidence all of the following:

"First: Plaintiff must show that through ... some trick or contrivance after construction of the Professional Building was completed, Dow engaged in affirmative acts of concealment that were intentionally designed to mislead and hinder this plaintiff from obtaining or seeking information about the possible causes of the masonry failure; and

"Second: Plaintiff must show that it was ignorant of the fraud and was unable to discover it through reasonable diligence; and

"Third: Plaintiff must show that the concealment or suppression of the facts *caused damage* to the plaintiff."

The instruction ends with the direction that if the jury finds each of the above elements, the verdict should be for the plaintiff and against Dow.

■ Dow suggests that the jury might have used this "free-floating" fraudulent concealment instruction to assign compensatory damages to Dow. Yet, Dow has not taken issue with the negligence and strict products liability theories upon which the general verdict could be sustained. Hence, Dow presumably has failed to demonstrate that if there was error in the giving of the instruction, it harmed Dow.

To some extent Dow is arguing that the evidence did not support giving the instruction, *see State v. Edgman* (1983), Ind.App., 447 N.E.2d 1091, because fraudulent concealment requires proof of a fiduciary relationship on which a duty to disclose would be based. However, Dow's cited case on fraudulent concealment reveals that the elements do not resemble the elements contained in Instruction 35:

The party asserting fraudulent concealment must establish by a preponderance of the evidence,

(1) the wrongdoer had a duty to disclose certain facts to another,

(2) it knowingly failed to do so, and

(3) the other justifiably relied upon such non-disclosure to his detriment.

*DeVoe Chevrolet–Cadillac v. Cartwright* (1988), Ind.App., 526 N.E.2d 1237.

In fact, 8402 argues precisely that point: instruction 35, denominated "fraudulent concealment" is merely a misnomer, and the court had never entirely rejected 8402's fraud claim, embodied in count I of its amended complaint, as it applied to Dow's conduct in the subsequent investigation. Thus, instruction 35 more closely resembles the elements of fraud: a material representation of a past or existing fact, known to be untrue by the party making it, and relied upon to the other party's detriment. *Peoples Trust Bank v. Braun* (1983), Ind. App., 443 N.E.2d 875. Fraud comprises all acts, omissions and concealments involving a breach of legal or equitable duty which results in damage to another. *Hinds v. McNair* (1980), Ind.App., 413 N.E.2d 586, 603.

8402 also points out that Dow tendered an instruction (15) which was substantially the same, and therefore cannot complain of error in the court's giving instruction 35. *See City of Indianapolis v. Satz* (1978), 268 Ind. 581, 377 N.E.2d 623. Dow's instruction was nearly the same, except for language in the third paragraph which would have required the jury to find that Dow's concealing facts in the 1976 investigation proximately caused the failure to the masonry panel.

This last point forms the basis for the second part of Dow's argument. Dow asserts that the instruction should have included a direction that the jury find a "causal relationship to an identified harm for which relief could have been granted." Dow insists that the only proof of damages from its 1976 conduct must lie either in the inducement of the release, or in the failure of the panels in the first place, reasoning that because the parties had stipulated to the cost of repairs, and that was the exact amount of the verdict for compensatory damages, the instruction was flawed.

Again, the question arises whether Dow could have been harmed where other theories supported the stipulated recladding expenses. 8402 provided *some* evidence that it incurred additional expenses for its investigation which were enlarged by Dow's obfuscation of the true cause of the masonry failure. That the jury did not return a larger compensatory award does not render the instruction faulty.

### V.

The cumulative effect of the trial court's prejudicial errors prejudiced a fair trial of the punitive damages claim and generated an excessive award based on non-existent claims and improper evidence appealing to the passion and prejudice of the jury.

Under this issue, which is essentially alleging that the punitive damage award was either excessive or completely inappropriate, Dow presents several issues which would have been more appropriately presented as substantive issues (and in some cases were). To use the argument that the punitive damages were excessive via several evidentiary errors is to bootstrap several errors under the guise of the punitive damage issue.

In a case which considered the inadequacy of *compensatory* damages, the court held that we will not deem the damages to be the result of improper considerations unless the amount of the award cannot be explained on any other reasonable ground. *Burris v. Riester* (1987), Ind.App., 506 N.E.2d 484.

■■■ Punitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather, some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, overzealousness, mere negligence or other such noniniquitous human failing. *Rose Acre Farms v. Cone* (1986), Ind.App., 492 N.E.2d 61. To overcome this presumption, the ultimate determination is

controlled by the malfeasor's state of mind, and punitive damages may be awarded upon a showing of wilful and wanton misconduct. *Id.*

On appeal, this court will reverse an award of punitive damages only when the amount assessed appears to be so outrageous as to impress the court at first blush with its enormity. *Nate v. Galloway* (1980), Ind.App., 408 N.E.2d 1317. An award is excessive when it is so great that it indicates prejudice, partiality, corruption or other improper motive. *Id.*

Citing evidence that Dow knew about Sarabond's corrosive propensities when the Professional Building began showing signs of wear, but failed to inform the owners of its findings, instead directing the focus of the investigation on the metal connecting device, 8402 contends the evidence supports punitive damages. 8402 also points to the evidence showing Dow's phenomenal wealth (total assets of $14.356 billion) as indicating that the $5 million punitive damages award is not excessive but would have the desired deterrent effect. This evidence is sufficient to sustain the award.

Dow also raises an issue that implicates not the size of the punitive damages award, but the standardless discretion with which juries assess punitive damages. While there are rumblings that the law in this regard may be ripe for change, see Justice O'Conner's concurring opinion in *Bankers Life and Cas. Co. v. Crenshaw* (1988), 486 U.S. 71, 108 S.Ct. 1645, 1654–56, 100 L.Ed.2d 62 we must await more definitive directions from the higher courts before implementing such changes.[1]

Judgment affirmed.

RATLIFF, C.J., and BAKER, J., concur.

---

1. As the Supreme Court determined in *Bankers Life,* the due process issue here has not been sufficiently raised. The bulk of Dow's due process argument reiterates its complaint that the trial was unfair because of the several evidentiary errors which must have affected the jurors' assessment of punitive damages.