PICADILLY, INC., Appellant
(Plaintiff Below),

v.

Gustin J. RAIKOS and Dennis L.
Thomas, Jr., Appellees
(Defendants Below).

No. 41A01–8908–CV–311.

Court of Appeals of Indiana,
First District.

June 6, 1990.

W. F. Conour, Rex E. Baker, Conour Doehrman, Indianapolis, for appellant.

John T. Lorenz, Jeffrey A. Doty, Kightlinger & Gray, Indianapolis, for appellees.

ROBERTSON, Judge.

Appellant-plaintiff Picadilly, Inc. (Picadilly) appeals the granting of summary judgment in favor of appellee-defendants Gustin Raikos and Dennis Thomas (Raikos and Thomas).

We affirm.

This action arose from a dram shop claim against Picadilly in which Picadilly was held responsible for injuries suffered by Charles Colvin in an automobile accident with a drunk driver, who had patronized

Picadilly's bar before she drove home and collided with Colvin's car. The full facts are set forth at *Picadilly, Inc. v. Colvin* (1988), Ind., 519 N.E.2d 1217. In that decision, the supreme court vacated the court of appeals' decision and upheld the jury verdict awarding Colvin punitive damages in the amount of $150,000. It held that an error in the jury instruction on punitive damages was waived, and the evidence was sufficient to show Picadilly's malicious conduct by clear and convincing evidence. *Id.* at 1221.

In October, 1986, Picadilly filed a complaint against attorneys Raikos and Thomas, who represented Picadilly in the dram shop trial, for failure to exercise proper care in defending Picadilly, "including but not limited to a failure to properly preserve any objection to the Court's improper jury instructions on punitive damages." In November, 1988, the trial court entered summary judgment for Raikos and Thomas in response to their motion. Prior to the entry of judgment, the supreme court handed down *Picadilly v. Colvin, id.,* in March, 1989. Shortly after summary judgment, in December, 1988, a United States Bankruptcy Court entered an order confirming Picadilly's plan of reorganization under its Chapter 11 petition for bankruptcy. As part of its plan, Picadilly listed the punitive damage claim, and provided that the claim would be discharged in full by a $5,000 cash payment to Colvin, allowance of a $15,000 class II unsecured claim, and the transfer to Colvin of Picadilly's malpractice claim against Raikos and Thomas.

This appeal is from summary judgment against Picadilly, with the sole issue being whether there remained a genuine issue of material fact respecting whether the attorneys' negligence caused any damage to Picadilly.

Attorneys Raikos and Thomas raise a threshold issue which we must address.

■ Attorneys Raikos and Thomas assert that the real party in interest is Charles Colvin, to whom Picadilly transferred its cause of action pursuant to the bankruptcy reorganization plan, and because legal malpractice claims are general-ly unassignable, this appeal may not be maintained. Although Indiana has not had occasion to decide whether legal malpractice claims are assignable, other jurisdictions have. Those which prohibit assigning such claims cite the peculiar nature of claims for attorney malpractice (as opposed to malpractice among other professions, like surveyors, *see, e.g. Essex v. Ryan* (1983), Ind.App., 446 N.E.2d 368). They argue

> the need to preserve the element of trust between attorney and client, which could be impaired if the attorney perceives a future threat of the client's assignment to a stranger or adversary of a legal malpractice claim. Similarly, counsel might be discouraged from pursuing vigorous advocacy on behalf of his or her client if that advocacy might alienate the adversary, who might someday be motivated to sue the attorney for legal malpractice under an assignment of rights. An attorney might also seek to please an employer-insurer at the expense of the insured's best interest, if the attorney fears the employer might someday turn over its malpractice cause of action to a third party. Finally, if malpractice claims could be bought and sold, the inevitable result would be raised malpractice insurance premiums.

*Jackson v. Rogers & Wells* (1989), 210 Cal. App.3d 336, 258 Cal.Rptr. 454; *accord, Christison v. Jones* (1980) 83 Ill.App.3d 334, 39 Ill.Dec. 560, 405 N.E.2d 8; *Moorhouse v. Ambassador Ins.* (1985), 147 Mich. App. 412, 383 N.W.2d 219; *H.N. Schroeder v. Hudgins* (1984), 142 Ariz. 395, 690 P.2d 114.

As persuasive as these decisions seem in the arena of assignments to third parties generally, we agree with the Maine court in *Thurston v. Continental Casualty Company* (1989), Me., 567 A.2d 922, in which the court held that that rationale did not justify the same result in its case where the insolvent corporation assigned its legal malpractice claim to a products liability plaintiff who had apparently asserted a claim against the corporation:

We hold first that there is no reason to prohibit the assignment of a legal malpractice claim *in a situation such as this.* We are not here confronted with the establishment of a general market for such claims; this assignee has an intimate connection with the underlying lawsuit. Although some cases from other jurisdictions flatly prohibit the assignment of any legal malpractice claim, their reasoning is not persuasive. The argument that legal services are personal and involve confidential attorney-client relationships does not justify preventing a client like 3K from realizing the value of its malpractice claim in what may be the most efficient way possible, namely, its assignment to someone else with a clear interest in the claim who also has the time, energy and resources to bring the suit.

*Thurston,* 567 A.2d at 923, (citations omitted). Although the corporation had surrendered all its assets to a major creditor, it was evident that the assignment to the products liability plaintiff was not pursuant to any formal plan resulting from a bankruptcy petition. Nevertheless, we believe the same reasoning applies in the instant case, where Picadilly's carefully formulated plan of reorganization includes a transfer of its malpractice claim to Colvin. *But cf. Christison, supra.* It seems especially just here to allow Colvin to assert his claim where the action has already been brought in Picadilly's name, and has been developed factually in the discovery process by Picadilly. Deciding a rather narrow issue solely on these peculiar facts, we hold that the transfer of Picadilly's cause of action to Colvin, via a Chapter 11 plan of reorganization, does not circumvent any established law in Indiana against such assignments, and does not do violence to any policy considerations prohibiting such assignments. Accordingly, we proceed to review the judgment from which Picadilly appeals.

■ In Indiana, an attorney may be held liable to his client for damages resulting from his failure to exercise ordinary care, skill and diligence. Breach of that duty, combined with damages proximately caused by the breach, completes a cause of action for attorney negligence. *Sanders v. Townsend* (1987), Ind.App., 509 N.E.2d 860. The specific error cited by Picadilly in its complaint is its attorneys' failure to object to an instruction read to the jury on punitive damages which failed to set forth a willful and wanton standard of conduct, and its attorneys' failure to tender a correct instruction.

■ The burden is on Picadilly to prove that it would not have suffered a punitive damage verdict had Raikos and Thomas objected to the erroneous instruction or tendered a correct instruction. *Hockett v. Breunig* (1988), Ind.App., 526 N.E.2d 995, (Shields, J., concurring). Raikos and Thomas reason that because the supreme court decided there was sufficient evidence to support a finding of malice by clear and convincing evidence, there remains no genuine issue of material fact on the elements of proximate cause or damages. A properly-instructed jury would have returned a verdict for punitive damages.

■ For reasons which find support in Judge Shields' concurring opinion in *Hockett, id.,* and cases in other jurisdictions, we conclude that Raikos and Thomas have successfully negated essential elements of Picadilly's claim, which Picadilly has failed to controvert. In *Hockett,* Hockett's attorney conceded that Hockett's malpractice case would depend on the result of Hockett's appeal from the denial of his petition for post-conviction relief alleging his plea was involuntary because he relied on advice of his lawyers representing that the State's case against him was stronger than it actually was. The appeal was unsuccessful, and the court of appeals held that Hockett could not show he would not have been incarcerated but for his attorney's advice, since the record demonstrated the voluntariness of his plea. Judge Shields would have decided that because the party against whom the doctrine of issue preclusion was asserted, Hockett, had a full and fair opportunity to litigate the issue of the voluntariness of his plea, then that same issue raised in a different proceeding could

be asserted, and resolved against him. *Id.* at 1003.

The defensive use of issue preclusion was upheld in *Gillion v. Tieman* (1980), 86 Ill.App.3d 147, 41 Ill.Dec. 648, 407 N.E.2d 1146. In that case, Gillion lodged a legal malpractice action against the attorney representing her in a juvenile proceeding in which the court found she was an unfit mother. Her attorney neglected to appeal that ruling, but on appeal to the Illinois Supreme Court on a writ of habeas corpus, the court held that the constitutional issue of her right to appeal which she had presented was irrelevant, where the record amply supported the trial court's finding that Gillion was an unfit mother. In the ensuing malpractice action, the trial court granted summary judgment in favor of Gillion's attorney, because, by the Illinois Supreme Court's decision, an appeal would not have been successful. Gillion had argued for the opposite conclusion, that the appeal would have been successful because the state had failed to meet its burden of showing unfitness by clear and convincing evidence.

In contrast to Gillion, Picadilly has not argued that the sufficiency of the evidence in *Picadilly v. Colvin* showing punitive damages would have any bearing on the outcome of its legal malpractice action. Yet, as we have stated, a determination of the sufficiency of the evidence on the question of punitive damages will determine whether Raikos and Thomas' omissions caused Picadilly any damage. That issue was decided against Picadilly in *Picadilly v. Colvin*, 519 N.E.2d 1217. The supreme court held, in response to an issue that Picadilly set forth, that the record supported punitive damages by the higher standard. Hence, Picadilly had the opportunity to fully and fairly litigate the issue which it presented on appeal. The use of issue preclusion is even more befitting here than it was in *Gillion*, because in *Gillion*, the supreme court's decision, which was the basis of the precluded issue, was reached after bypassing the constitutional issue which had been the basis of Gillion's habeas corpus action under review. Here, Picadilly presented the issue squarely in its appellate brief.

Picadilly also submits that a properly-instructed jury could have awarded far less in damages than the jury did, and because of that possibility, there must be a trial to determine the measure of damages—the difference between what the malpractice jury would award, and the amount the original jury awarded. Picadilly overlooks the proper measure of punitive damages: that amount which will serve to punish and deter the conduct in the future. *Nate v. Galloway* (1980), Ind.App., 408 N.E.2d 1317. Once the jury decided that Picadilly's conduct deserved punishment, it necessarily looked to Picadilly's wealth to determine an appropriate figure. *Id.* at 1323. Therefore, the causal connection between Raikos and Thomas's conduct and the *amount* of punitive damages is even more tenuous. Showing that an award of damages against the plaintiff would have been less is also Picadilly's burden. *See Sanders v. Townsend* (1987), Ind.App., 509 N.E.2d 860.

Finally, Picadilly argues that summary judgment was inappropriate because Picadilly's complaint did not foreclose other errors and omissions in Raikos and Thomas's defense of Picadilly that led to the large judgment; the trial court erroneously focused on only the issue of the incorrect jury instruction. Yet, the opponent of a motion for summary judgment may not rely upon the bare allegations made in the pleadings to avert judgment where the motion's proponent has established his entitlement to the requested relief. *Durakool v. Mercury Displacements* (1981), Ind.App., 422 N.E.2d 680; *Shideler v. Dwyer* (1981), 275 Ind. 270, 417 N.E.2d 281.

For the foregoing reasons, we hold that Raikos and Thomas have succeeded in establishing that they are entitled to summary judgment.

Judgment affirmed.

MILLER, J., concurs.

BAKER, J., concurs in result with separate opinion.

BAKER, Judge.

While I concur with the majority's affirmation of the trial court's decision, I have grave concerns regarding the wisdom of opening the Pandora's box of assignment of legal malpractice claims.

The majority acknowledges the sound and persuasive nature of the numerous decisions which hold that assignment of legal malpractice claims is void as against public policy. Relying on *Thurston v. Continental Casualty Co.* (1989), Me., 567 A.2d 922, the majority nonetheless finds that assignment is valid and appropriate in this case. I disagree and dissent on this issue for two reasons.

First, I agree with the weight of authority that this type of assignment should not be allowed. "[T]he unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship ... invoke [broad] public policy considerations." *Goodley v. Wank & Wank, Inc.* (1976), 62 Cal.App.3d 389, 397, 133 Cal. Rptr. 83, 87. "[T]he real substance of a malpractice action is a client's claim that his attorney breached his personal duty and trust to that client by failing to exercise the requisite degree of care and skill or by failing to give the utmost loyalty and fidelity to the client's interests." *Christison v. Jones* (1980), 83 Ill.App.3d 334, 338, 39 Ill.Dec. 560, 563, 405 N.E.2d 8, 11.

The attorney-client relationship, the fiduciary role of the attorney, and the regulation of attorneys are matters of great public concern. The Constitution of our State entrusts exclusive, original jurisdiction to the Indiana Supreme Court over matters relating to the practice of law. Indiana Const. art. VII, § 4. I believe, as did the *Goodley* court, that allowing the assignment of legal malpractice claims would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.

*Goodley, supra,* 62 Cal.App.3d at 397, 133 Cal.Rptr. at 87. If such a change is to be levied on the profession and the public, then only our supreme court, the entity with exclusive constitutional authority over these matters, should make the decision.

Second, even if I believed we should allow assignment of legal malpractice claims, I would not do so in this case. I disagree with the majority's reliance on *Thurston, supra,* because I find the reasoning in that decision inherently flawed. In *Thurston,* as here, the losing defendant assigned its malpractice claim to the victorious plaintiff. As Raikos and Thomas point out, this requires the plaintiff to change its position by 180 degrees to prosecute the malpractice claim. At best, it is unsettling that a plaintiff in Colvin's position would have the opportunity, in essence, to mount a collateral attack against a judgment in his favor by suing the lawyers who represented his defeated opponent. At worst, the result in *Thurston* and here will lead to a practice by defeated defendants of routinely assigning legal malpractice claims (meritorious or otherwise) as a means of avoiding or deferring payment of judgments against them.[1]

---

1. The possibilities for manipulation and abuse, as well as harm to the profession and the public it serves, are virtually limitless. In a recent decision, the Court of Appeals of Michigan disallowed an excess insurer to bring a malpractice action against one of its customer's defense attorneys on a subrogation theory. *American Employer's Ins. Co. v. Medical Protective Co.* (1988), 165 Mich.App. 657, 419 N.W.2d 447, *appeal denied.* The insurer argued the attorneys had negligently failed to settle a claim which was subsequently litigated adversely to the customer's position. The court held that a contrary decision "would be tantamount to saying that insurance defense attorneys do not owe their duty of loyalty and zealous representation to the insured client alone ... and would contradict the personal nature of the attorney-client rela-

Over time, I fear this practice will lead to exactly that which the majority and I disdain: an open market for the assignment of legal malpractice claims.

I therefore dissent on the threshold issue of the assignment of the malpractice claim. I concur with the majority's holding that the trial court properly granted summary judgment to Raikos and Thomas on the basis of issue preclusion.

tionship." *Id.,* 165 Mich.App. at 660, 419 N.W.2d at 448. A contrary decision "would also encourage excess insurers to sue defense attorneys for malpractice whenever they are disgruntled by having to pay within limits of policies to which they contracted and for which they re-ceived premiums. Were this to occur, [I] believe that defense attorneys would come to fear such attacks, and the attorney-client relationship would be put in jeopardy." *Id.,* 165 Mich. App. at 660–61. 419 N.W.2d at 448–49.