AMERICAN INDEPENDENT MANAGEMENT SYSTEMS, INC., and William Tully, Appellants-Defendants,

v.

Larry F. McDANIEL and Shirley A. McDaniel, Appellees-Plaintiffs.

No. 3–682A124.

Court of Appeals of Indiana, Third District.

Dec. 20, 1982.

Harold Amstutz, Moore, Sandy, Moore, Deets & Kennedy, Lafayette, for appellants-defendants.

Robert M. Parker, John C. Hamilton, Parker, Brunner & Hamilton, South Bend, for appellees-plaintiffs.

STATON, Judge.

Larry and Shirley McDaniel sued American Independent Management Systems, Inc. (AIMS) and its president, William Tully, for damages arising out of alleged fraudulent misrepresentation and breach of contract. The trial court found AIMS and Tully jointly and severally liable for $9,384.91 in damages due to fraudulent misrepresentation and found AIMS liable for $9,384.91 in damages due to breach of contract. The following issues must be considered on appeal.[1]

1. Whether the representations made to the McDaniels constitute fraud;
2. Whether Tully is personally liable for a tort committed while president of AIMS; and
3. Whether the award of damages is erroneous.

Affirmed.

In November, 1975, Larry and Shirley McDaniel saw an advertisement for AIMS in the newspaper. In response to the advertisement, they attended a meeting at which William Tully, the president of AIMS, described the system for computerized family financial management which AIMS made available to consumers through its agents. Both Tully and a brochure prepared by AIMS described the system as a nationwide program, run by AIMS' experienced organization, which provided a thorough training program for agents who recruited clients for their own agencies. As

1. Because we affirm the trial court's determination that AIMS and Tully are jointly and severally liable for damages arising from their fraudulent misrepresentations, we need not review the court's findings regarding breach of contract nor must we consider whether the agreement was a franchise agreement or an agency agreement.

the program was described, AIMS provided such services as monthly bulletins, preparation of tax returns, and investment advice.

After the meeting, the McDaniels called the Better Business Bureau and confirmed that AIMS had been in business for eight years and no complaints against it had been lodged with the Bureau. They also talked with Jack Parsons, an old friend and former insurance salesman, who was the AIMS district representative. Then they signed the contract and set up their office, following the procedures recommended in the AIMS manual.

In January, 1976, they attended a two-day training session in Merrillville. At this time, they received the AIMS training manual and learned how to recruit clients and how to fill out the forms provided by AIMS. Jack Parsons also attended this course; he had received no training prior to January, 1976.

After the January training session, the McDaniels attempted to start their business. Although they had been promised that AIMS would supply materials for a mailing and advertising material, the McDaniels had to prepare their own mailing and advertising because the materials from AIMS were not ready when promised.

Between January, 1976 and December, 1976, the McDaniels recruited a number of clients. However, during that time they did not receive the services promised by AIMS. They received only one monthly newsletter, Mrs. McDaniel had to prepare tax returns for a client because AIMS did not do so, and their clients received no investment advice. One of the clients who left their agency specifically stated that he had been interested in the investment advice.

At the peak of the program, in April, 1976, AIMS had fourteen agents in seven states. The company ceased operation on December 9, 1977.

## I.

## Fraud

■ William Tully and AIMS contend that the evidence does not support the trial court's finding of fraud. The trial court issued special findings pursuant to Ind. Rules of Procedure, Trial Rule 52(A). These findings and the judgment will not be set aside on appeal unless they are "clearly erroneous." TR. 52(A). This standard requires that the findings be disturbed only if the record contains no facts or inferences supporting the findings. *Indiana Tri-City Plaza Bowl, Inc. v. Estate of Glueck* (1981), Ind.App., 422 N.E.2d 670, 674. In determining whether the findings are "clearly erroneous," we will not reweigh the evidence nor determine the credibility of the witnesses, *id.,* and we will consider only the evidence on the record which supports the judgment and the reasonable inferences which can be drawn from that evidence. *Moore v. Moriarty* (1981), Ind.App., 415 N.E.2d 779, 781. The judgment controls as to any issue not covered by the special findings, TR. 52(D)(2), and must be upheld if it is sustainable on any theory. *Hogan Transfer and Storage Corp. v. Waymire* (1980), Ind.App., 399 N.E.2d 779, 787.

■ Fraud requires that material misrepresentations as to past or existing facts be made with knowledge of or reckless disregard for the falsity of the statements and that the misrepresentations be relied upon to the detriment of the relying party. *Stanzione v. Pascevich* (1982), Ind.App., 431 N.E.2d 847, 849.

The trial court made the following findings regarding representations made to the McDaniels:

"3. The brochure is a professionally prepared document. Among its representations upon which plaintiffs relied in deciding whether to enter into a contract with defendants were the following:

(a) 'Applications are being accepted throughout the country.' (Exh. 1, page 1).

(b) 'The cumulative experience of Senior Management Personnel has given AIMS the experience to insure success to a new agent. AIMS has everything programmed for you, including extensive training.' (Exh. 1, page 1).

(c) 'AIMS will serve the American Family through its nationwide network of agencies.' (Exh. 1, page 2).

(d) 'AMERICAN INDEPENDENT MANAGEMENT SYSTEMS, INC., is entering its eighth year in Data Processing, Bookkeeping, and Financial Management Services, specializing in prompt personal services.' (Exh. 1, page 2).

(e) 'The AIMS systems is being marketed, nationwide, through independent agencies strategically located throughout the nation.' (Exh. 1, page 2).

(f) 'AIMS, through its agents, offers the individual a variety of financial management services which include a unique record keeping system, computer services, *complete income tax service* and many other services all designed to help the individual through sound financial management, to more successfully reach his goal in life.' (Exh. 1, page 2).

(g) 'The *technical aspects of the services are the responsibility of the Home Office Staff.* Agents are taught the necessary skills in a thorough training program at the AIMS training center. In the field, training is supplemented with detailed operating manuals.' (Exh. 1, page 2).

\* \* \* \* \* \*

(k) The defendants described the following services as available to their agents to provide, in turn to their clients, as 'services you will be offering.' (Exh. 1, pp. 4–6).

(a) '*Monthly Management Bulletins* This publication, prepared by management and tax experts, yet written for the layman to understand, keeps the individual informed of the new tax rulings and regulations. It provides up-to-date vital financial information necessary in maintaining a properly managed family budget. It keeps your client aware each month of his continual increasing insurance needs, explains new savings programs, investment programs, and deals with many other consumer oriented problems.'

(b) '*Management Advisory Service* You will be trained and in the unique position to advise your clients on how to improve their living standards and how to build a sound financial future. This is accomplished by showing them how to use their management reports, adjust spending habits, and develop sound savings and investment programs . . . .'

(c) '*Preparation of Income Tax Returns* The AIMS tax department will prepare personal income tax returns (1040, schedules A & B and the equivalent state and local returns) *for each AIMS client.* Accuracy is guaranteed with AIMS paying any penalties for its errors.'

(d) '*Savings Plans* By being an AIMS agent, you will be able to help your client set up emergency savings funds through specified banks cooperating with AIMS on savings programs where your client can draw top interest even on his small amounts of savings. This is accomplished through combined savings of many of AIMS clients which become a very large savings account for the banks and is very profitable to both the bank and your client . . . .'

(e) '*Investment Advice* You will be able to advise your clients with confidence on various investment programs including some programs on a joint venture basis for large returns. Your clients can now have the same leverage as the large investor.'

(f) '*Credit Management* Your agency will be kept abreast of the going interest and finance charges in your area and various criteria for loans from lenders in the area. With this information at your fingertips you will save your client many dollars in time and interest when it comes to borrowing.'

Following the foregoing series of services that the defendants provided a proposed agent, defendants' brochure includes the statement that, 'Other programs are being considered and devel-

oped and will be made available as they are perfected and proven.' (Exh. 1, page 7). Such statement implies that each of the preceding items already were 'perfected and proven.'

4. Toward the end of defendants' brochure (Exh. 1, page 8), defendants made the following representations:

(a) '*Training-Complete; Thorough, Continuous* Before you begin operating an agency you will attend the AIMS training school at Monticello, Indiana where all phases of a successful agency are taught....

A semi-annual seminar will be held for all agents in a central location. Nothing is left to chance. An operating manual outlines step by step the successful formula for every aspect of this operation. You will benefit and profit from this knowledge. A monthly newsletter will keep you informed and up-to-date on what is going on in the industry and what AIMS is doing to further expand your agency. Group training sessions will be held monthly within each area by your district manager. A school training program will be held for all your new employees each month enabling them to better serve you and your clients. We repeat— nothing is left to chance. All you must do is follow the program as developed for a successful agency.

5. The foregoing representations and statements similar to them were repeated orally by the defendant William Trully in the course of the presentation attended by plaintiffs described in Finding No. 2 above." [*sic*]

█ Although some of the statements made by Tully and appearing in the AIMS brochure could be considered statements of future intent, AIMS and Tully did present the financial management program as existing at that time on a nationwide basis, with experienced personnel, computer services, record keeping system, tax service, and a training program in operation. However, the record shows that, in April, 1977, some months after the McDaniels signed their

contract, AIMS had only fourteen agents in seven states with eight of those agents in Indiana. The McDaniels were assisted in operating their agency by Jack Parsons, the District Representative of AIMS. Parsons was a former insurance salesman who attended the same training session the McDaniels did. His expertise was in the area of sales, not financial management. During 1976 the McDaniels received one "monthly newsletter" and had to prepare a client's tax return themselves because AIMS failed to do so. The McDaniels were given one training session lasting two days, in addition to a visit to the home office. Materials for advertising and public relations were not ready at the time of the training session and were not supplied until the McDaniels had been in business for some time. The evidence supports the trial court's findings and its conclusion that the representations were false.

The second requirement is that the representations be made with knowledge of their falsity. AIMS made the representations about itself. Tully, as president, approved the statements in the brochure and reiterated them himself. From their conduct, it may reasonably be inferred that Tully and the corporation knew the representations were false.

The evidence also supports the trial court's conclusion that the McDaniels relied on the misrepresentations. The McDaniels testified that they relied on the existence of an established nationwide program which could provide thorough training and support for them. They exercised reasonable care, see *Fleetwood Corp. v. Mirich* (1980), Ind.App., 404 N.E.2d 38, 45, in checking with the Better Business Bureau and talking to Jack Parsons.

The McDaniels relied upon the representations to their detriment. They paid $1,500.00 to AIMS and they incurred substantial expense in setting up their business. The evidence supports the trial court on each element necessary to prove fraud. Therefore, we affirm the judgment of fraud against Tully and against AIMS.

## II.

### Personal Liability

■ Tully contends that he should not be held personally liable to the McDaniels. Although it is true that a corporate officer or shareholder may not be held liable for acts by the corporation merely because he is an officer or shareholder, *Birt v. St. Mary Mercy Hospital of Gary, Inc.* (1977), Ind. App., 370 N.E.2d 379, 382, Tully personally participated in the fraud. He cannot escape liability by claiming that he acted on behalf of the corporation because an agent is liable for his own torts. *Howard Dodge & Sons, Inc. v. Finn* (1979), Ind.App., 391 N.E.2d 638. The record shows that Tully personally made representations to the McDaniels about the AIMS program. Furthermore, he knew what the brochure said and could have changed it before it was printed. Therefore, the trial court did not err in finding Tully personally liable for fraud.

## III.

### Damages

■ Tully and AIMS contend that any losses suffered by McDaniels were not the proximate consequence of any misrepresentations made. The evidence showed that the McDaniels signed a contract with AIMS and started their business in reliance upon the misrepresentations. They paid AIMS $1,500.00 and set up their office in accordance with the AIMS manual. Their expenditures in doing so were the foreseeable result of reliance on the misrepresentations made by Tully and AIMS; therefore the award of damages was proper.[2]

HOFFMAN, P.J., and GARRARD, J., concur.

---

2. Tully and AIMS do not attack the specific amount awarded by the trial court.