**William O. WARREN and Employment Telecom Systems, Inc., Appellants (Defendants Below),**

v.

**Daniel L. WHEELER, John P. Brown, and Roger E. Bird, Appellees (Plaintiffs Below).**

**No. 49A02–8901–CV–31.[1]**

Court of Appeals of Indiana, First District.

Feb. 26, 1991.

**1.** This case was reassigned to this office on January 2, 1991.

Terrill D. Albright, Joseph H. Yeager, Jr., Baker & Daniels, Indianapolis, for appellants.

Michael L. Hanley, Vernon J. Petri, Vernon J. Petri, P.C., Indianapolis, for appellees.

ROBERTSON, Judge.

William O. Warren and his company, the Employment Telecom Systems, Inc. [ETS] appeal the judgment after a jury trial in favor of plaintiffs, Daniel L. Wheeler, John P. Brown, and Roger E. Bird, in their action based on fraud. Judgments were entered upon the jury's verdicts in the amounts of $144,705.13 for Wheeler, $146,944.33 for Brown, and $62,985.00 for Bird. Wheeler's Brown's, and Bird's company, The Exchange Network, Inc., [TEN] appeals the trial court's removal of its claim against the defendants from the jury. We affirm the decision below in all respects.

### FACTS

In 1981, William O. Warren, who was experienced and knowledgeable in the fields of personnel and human relations, decided to start a new business. Warren developed a computer network system to be called the "Human Resource Information Network or "HRIN" [the System] which would make available to corporate subscribers a large library of human relations data. The system was designed so that the human relations director of a corporate subscriber could scan a data bank of job seekers to fill job openings in that subscriber's company. In addition to the recruiting function described above, the System would permit subscribers to communicate by electronic mail. Warren incorporated Employment Telecom Systems, Inc. [ETS] to market the HRIN System.

In 1981, Warren solicited Wheeler to provide a source of employee candidates for the corporate subscribers to the System. Wheeler had been in the employment agency business for years and had been running his own employment agency. Warren represented to Wheeler that 22 corporations had subscribed to the System having paid a substantial sum of money, approximately $10,000.00 each, to subscribe. Warren represented that each of these corporate subscribers had the necessary equipment and capability to access the System, were on-line, and had a present need to use the system.

Warren made the same representations as set out above to Brown. Wheeler and Brown founded The Exchange Network, Inc. [TEN] to sell HRIN subscriptions to employment agencies who then could interact electronically with the corporate subscribers to place job seekers.

Bird owned and operated one of the first employment agencies to subscribe to TEN. Bird joined forces with Wheeler and Brown and invested his time and money in TEN and became a stockholder and officer of TEN.

Warren's representations turned out to be false as only three (3) of the original 22 corporations were paid subscribers on the network. Some of the corporations originally listed as being paid subscribers had been given free subscriptions and others were simply not on-line. One of the manufacturing plants listed on the System as needing employees had been closed. One of the companies Warren had listed on the System had a policy of hiring from within and had never had any interest in or intention of using the System.

Warren had discouraged the TEN group from contacting the corporations by telephone and encouraged them to communicate with the corporations via the electronic mail service. Warren explained that the Human Relations directors of these corporations were annoyed by telephone calls

from employment agencies. The TEN group members—having experience in the business—knew this to be true as a general proposition and complied with Warren's wishes. However, when electronic mail messages were sent, the System would indicate that the corporate subscribers had received the messages when in fact they had not—or were not even connected to the network.

As time went on, Warren continued to misrepresent the number of corporate subscribers to the TEN group and others. He continuously represented ever higher numbers. In October of 1983, Warren represented to TEN and a group of employment agencies that he had 1500 locations on line. It was later discovered that by June of 1983, at the most, only 17 paid corporate subscribers were on-line, and even this number was disputed.

After fifteen months of operation, the TEN group became discouraged because the System had only succeeded in placing three (3) job seekers. After Warren succeeded in stalling the TEN group some more, the TEN group made telephone calls to the supposed corporate subscribers and discovered the fraud. Soon afterwards, the TEN group ceased operations.

The TEN group expended substantial time, energy, and money in recruiting employment agencies to subscribe to the System. When TEN ceased operations, it had unpaid bills to creditors outstanding. In addition, TEN accepted almost $75,000.00 in fees from the employment agencies who subscribed to the System, many of whom—since the fraud was discovered—have demanded to be reimbursed. The corporation, TEN, through its officers, feels obliged to reimburse these agencies should it prevail in its lawsuit. TEN had other shareholders who are not parties to this suit.

The present trial lasted 13 days spread over six weeks. The record consists of 4,164 pages bound in 18 (Eighteen) volumes.

Additional facts are supplied as necessary.

## DECISION

### I.

#### Whether Exhibit 203 was erroneously admitted?

 Warren's company, ETS, ultimately prospered and was sold to the Bureau of National Affairs, Inc. [BNA] in a complex transaction that required the continued involvement of Warren and another co-owner, Wingington.[2] A dispute arose and Warren and Wingington sued BNA praying for judgment in the amount of $4,560,000 each representing their unfulfilled interest in the sale transaction.

Exhibit 203 was admitted into evidence over Warren's objection. Exhibit 203 is a settlement demand letter from Warren's attorneys to BNA's attorneys. In this letter, Warren and Wingington each demand $2,500,000.00 in settlement of their claims.

Warren claims the trial court erred in admitting this letter into evidence because the letter is irrelevant in the present lawsuit and even if it is relevant, its prejudicial nature outweighs its probative value. Warren asserts the real effect of this document was to convince the jury that Warren is a very wealthy man with a deep pocket. He argues that the value of his claim in the lawsuit was tangential to the real issues of trial and was injected into the case by Brown's emotional statement that Warren had earned $10,000,000.00 impliedly from the efforts of the TEN group.

Warren equates the demand letter to a mere offer to sell which is properly excluded as evidence of value. *State v. Lincoln Memory Gardens, Inc.* (1961), 242 Ind. 206, 177 N.E.2d 655. In *State v. Lincoln Memory Gardens, Inc.*, the value of a certain piece of property was at issue in a condemnation case. The trial court excluded testimony of an offer to sell the property. Our supreme court affirmed holding:

> A mere offer to buy or sell property is not a measure of the market value of a

---

suit. The jury returned a verdict in his favor.

similar property. It is incompetent to prove the market value of the property because the asking price is only the opinion of one who is not bound by his statement, and is too unreliable to be accepted as a correct test of value.

177 N.E.2d at 658.

Exhibit 203 is more than a mere offer to sell as properly excluded in *State v. Lincoln Memory Gardens, Inc.* The demand letter is four (4) pages long and contains a detailed analysis of the computation of the value of Warren's and Wingington's claims arising out of the sale of ETS, the company that markets the HRIN System to corporate subscribers.

Moreover, the evidence concerning the value of Warren's claim is not limited to the demand letter, Exhibit 203, alone. Other evidence was presented concerning the value of the claim. For example, the complaint in the lawsuit against BNA was admitted into evidence without objection. In the complaint, Warren and Wingington asserted that the payout under the BNA purchase plan was worth $4,900,000.00 to each of them. They pray for judgment in the amount of $4,560,000.00 each. Further, Exhibit 203 was admitted through Wingington who testified that BNA had offered them significantly less than $200,000.00 each to settle the claims.

The admissibility of evidence is within the sound discretion of the trial court. *English Coal Co., Inc. v. Durcholz* (1981), Ind.App., 422 N.E.2d 302. Evidence of the defendant's worth is relevant to the issue of punitive damages. *Nate v. Galloway* (1980), Ind.App., 408 N.E.2d 1317.

In the present case, the plaintiffs claimed punitive damages. Therefore, Warren's net worth was at issue and evidence regarding the value of Warren's claim relating to the sale of his interest in ETS was relevant to prove Warren's net worth and the calculation of punitive damages. Further, considering all the evidence regarding the value of the claim, the demand letter—which contained a detailed valuation analysis—was not excludable as being a mere offer to sell.

We hold the trial court did not abuse its discretion in admitting Exhibit 203 into evidence. Therefore, we find no error.

## II.

### Sufficiency

Warren argues the TEN group failed to carry its burden of proof on every element of its claim of fraud. The elements of fraud, which must be proved by the preponderance of the evidence, are: a material misrepresentation of past or existing fact made with the knowledge that the representation was untrue or recklessly made and reliance on that representation by another party resulting in that party's acting to his detriment. *South v. Colip* (1982), Ind.App., 437 N.E.2d 494. In order to reverse a fraud judgment, the appellant must demonstrate that, as a matter of law, one or more of the essential elements of actionable fraud were not established. *Tutwiler v. Snodgrass* (1981), Ind.App., 428 N.E.2d 1291.

### A.

■ Warren first argues that *only some* of the misrepresentations made by Warren were misrepresentations of existing fact and therefore many other misrepresentations were not actionable. He points to many misrepresentations he made and characterizes them as mere predictions or promises rather than misrepresentations. He also argues that some of the documents he prepared to induce the reliance of the TEN group were forward looking and therefore not actionable as misrepresentations of existing fact.

Warren admits in his reply brief that evidence exists to support the TEN group's claim. He admits that the TEN group's claim may rest upon Warren's misrepresentation of the number of corporate subscribers who were on-line in 1982. He only asks this court "to limit its analysis to those misrepresentations which were actionable." (Warren's reply brief p. 5).

We will indulge Warren. We will refrain from sifting through the great number of his misrepresentations to glean which ones

were actionable and which ones were not. We will simply affirm the jury verdict as supported by the evidence that Warren misrepresented the number of corporate subscribers on-line in 1982. Therefore, we find no error.

## B.

■ Warren next argues that the TEN group wholly failed to present evidence supporting the inference that its reliance was reasonable. He argues that the TEN group failed to guard against the fraud because had they made a few phone calls in August of 1982 to the corporate subscribers listed by Warren as paid subscribers they would have discovered Warren's fraud.

The evidence most favorable to the verdict indicates that Warren requested that the TEN group refrain from making phone calls to the purported corporate subscribers. He instead requested them to use the electronic mail service provided by the System. The System itself served to perpetrate the fraud further by misrepresenting to the user that an electronic message had been sent to and received by the corporate subscriber even if the purported subscriber was not on-line.

One relying upon a representation must exercise ordinary care and diligence to guard against a fraud, but the requirement of reasonable prudence in business transactions is not extended so as to permit an intentional fraud perpetrated on the unwary. *Carrell v. Ellingwood* (1981), Ind. App., 423 N.E.2d 630. The evidence as outlined above supports the conclusion that the intentional fraud perpetrated by Warren included a scheme whereby Warren induced the TEN group to refrain from making the very calls he now asserts were required to establish reasonable diligence in avoiding the fraud.

We hold that the evidence supports the jury's conclusion that the TEN group exercised reasonable prudence in protecting itself from Warren's intentional fraud. Therefore, we find no error.

## C.

■ Warren argues the evidence does not support a finding that his misrepresentations caused TEN's failure. Warren has lost sight of the theory of damages pursued by the TEN group. The TEN group did not seek expectation damages arising out of the failure of their business. Instead, the TEN group pursued and recovered under a reliance theory of damages. The TEN group has argued all along that they simply would not have made the substantial investment in time, energy, and money in TEN had they not been deceived regarding the true status of the HRIN System.

Warren does not argue the evidence fails to support the TEN group's claim for damages based upon a reliance theory or that damages based upon a reliance theory are not available in this case. Therefore, Warren has failed to present a cogent argument and this issue is waived pursuant to Ind.Appellate Rule 8.3(A)(7).

## D.

■ Warren asserts the damage awards were too great because they reflect improper elements not supported by the instructions regarding damages given to the jury. Warren has placed tables in his brief to demonstrate the manner in which he asserts the jury arrived at its awards. He argues that Wheeler and Brown were awarded their special damages claimed—to the penny—plus $20,000.00 that may be attributable to punitive damages, emotional damages, loss of credit or some combination thereof. Similarly, he argues Bird was awarded his special damages claimed—to the penny—plus $10,000.00.

Warren asserts that the special damages claimed by the plaintiffs reflect certain improper elements that were disallowed by the trial court and not reflected in the jury's instructions. He argues that, because the amounts awarded obviously reflect these improper elements, the jury engaged in misconduct and the awards must be reversed.

We have rejected "to the penny" assaults upon general jury verdicts containing both

special and general damages. *Symon v. Burger* (1988), Ind.App., 528 N.E.2d 850. We are unable to actually look into the minds of jurors to determine how a particular award was computed. *Id.* Therefore, we will affirm an award of damages based upon a general verdict if the award falls within the bounds of the evidence. *Id.* We will not reverse an award containing punitive damages as excessive unless the award clearly appears to have been the result of passion or prejudice. *Tutwiler, supra,* 428 N.E.2d 1291. The amount of punitive damages should depend upon the nature of the wrong and what amount is likely to impact upon the particular defendants and prevent others from future similar wrongdoing. *Id.*

The evidence in the light most favorable to the verdict indicates that Warren made millions of dollars when he sold ETS, the company founded to market the HRIN System. The value of ETS was enhanced by the TEN group's substantial efforts in recruiting employment agencies to interact with the System. The TEN group would not have expended the enormous amount of time, effort, and resources had it been apprised that the System did not have nearly the number of corporate subscribers Warren represented it to have.

Under these circumstances, we cannot conclude the damages awarded in this case which may contain elements of punitive damages and damages of a general nature were excessive. Therefore, we find no error.

■ Warren next argues the awards reflect damages accruing beyond the time he should reasonably be held liable. He asserts the evidence is clear that the TEN group was aware of facts that should have led to the discovery of the fraud by November of 1983 or even earlier. He argues the jury erroneously awarded the TEN group damages that accrued after that time.

We will not address the merits of Warren's "time frame" argument. Instead, we will resolve this issue in a manner similar to that employed above. We have no way to look into the minds of the jurors who rendered a general verdict to determine

how the awards of damages were computed. *Symon, supra.* Considering the damage awards could contain elements of punitive and other general damages, we can easily conclude the awards were well within the range of the evidence even if the jury cut off the TEN group's recovery in November of 1983 or some earlier time. Therefore, we will not presume the jury improperly considered damages accruing during some inappropriate time frame. Therefore, we find no error.

### III.

#### Roger Bird's Claim

■ Warren argues that he never made any representations to Bird. He argues that he is not liable to Bird because any misrepresentations relied upon by Bird were communicated by Warren's business associate, Wingington, for whom the jury found on the issue of liability.

While we are not about to intimate that—in order to be actionable—fraud must ordinarily be perpetrated face to face, this issue is easily resolved. The jury could have concluded that Warren not only lied through his teeth but also used the System to perpetrate his fraud. Warren rigged the System so that it appeared to be connected to many corporate subscribers who were in fact not on-line. He also rigged it so that it appeared possible to communicate with these bogus subscribers through electronic mail. Warren perpetrated the fraud through the System in order to induce persons like Bird in the employment agency business to provide him electronic access to employment agencies and a data bank of job seekers.

The misrepresentations upon which this lawsuit is based were manifested upon the computer screens accessed to the System and were communicated to many persons. Therefore, we believe it is immaterial that Warren never lied to Bird's face. Bird relied upon the Warren's misrepresentations communicated through the System to his detriment. We conclude the misrepresentations communicated through the Sys-

tem are sufficient to support Bird's claim. Therefore, we find no error.

## IV.

### TEN's allegation of cross-error

■ The TEN group's corporation, TEN, argues that the trial court erroneously removed its claim for damages from the jury by refusing tendered instruction number 3 designed to enable the jury to assess damages in TEN's favor. TEN asserts the trial court erroneously based its decision to remove its claim from the jury by finding that TEN had not sustained damages separate and distinct from those suffered by the TEN group and therefore its claim would constitute a double recovery in favor of the TEN group.

TEN had outstanding debt when it ceased operations. It argues it is entitled to compensation for net expenses and outstanding debt incurred as a proximate result of Warren's fraud. It also asserts that it accepted almost $75,000.00 from employment agencies for subscriptions to the System based upon the misrepresentations. It argues that if it recovers money from Warren, it is obliged to reimburse money to these agencies, many of whom have demanded restitution. "Otherwise, TEN is left holding the bag for Warren's fraud." (TEN's brief on cross-appeal, p. 6.)

TEN's tendered instruction No. 3 reads as follows:

> If you find for the Plaintiff The Exchange Network on the question of liability on the issue of fraud, you then must determine the amount of money which will fairly compensate plaintiff for those elements of damage which were proven by the evidence to have resulted from the wrongful conduct of defendants. You may consider:
>
> 1. Those sums invested in the Exchange Network by stockholders other than John Brown, Dan Wheeler and Roger Bird.
>
> 2. Those sums The Exchange Network owes to vendors of services of products for which The Exchange Net-

work received for which The Exchange Network contracted in order to operate.

> 3. Those sums The Exchange Network received from employment agencies it solicited to access the System and which should be repaid because the inducement to access the System was fraudulent.

Standing is a jurisdictional element which addresses the question of whether the complainant is the proper party to invoke the power of the court; it is a restraint on the exercise of the court's jurisdiction in that the court has no authority to proceed with the cause of action or decide any issues in the case unless there is a demonstrable injury to the complaining party. *State ex rel. State Bd. of Tax Com'rs v. Marion Superior Court, Civil Division, Room No. 5* (1979), 271 Ind. 374, 392 N.E.2d 1161. The first and third elements of damages described in the above tendered jury instruction describe sums that nonparties invested in or paid to TEN. These losses may very well be the proximate result of Warren's fraud. However, these losses accrued to the nonparties and therefore TEN lacks standing to assert these claims on the nonparties' behalf.

■ We do not reach the same conclusion with respect to the second element of damages described in the instruction above which pertains to debts incurred by TEN through its operations. In *American Independent Management Systems, Inc. v. McDaniel* (1982), Ind.App., 443 N.E.2d 98, the plaintiffs, victims of fraud, started a business in reliance on material misrepresentations made by the defendants. We held that the expenditures made in starting up this business were properly recovered under the theory of fraud because they were the foreseeable result of reliance on the misrepresentations.

An award to TEN as compensation for its operational expenditures made in reasonable reliance on Warren's fraud would not constitute a double recovery for the TEN group. TEN has shareholders which are not parties to this lawsuit; thus, TEN is not the alter ego of the plaintiffs of this lawsuit. Further, the expert who calculated the TEN group's losses took into consid-

eration the benefit received by the TEN group from TEN's generation of Subchapter S corporation pass-through losses. Therefore, we conclude that TEN would have been entitled to recover its operational expenditures that were the foreseeable result of its reliance upon Warren's fraud.

 However, instructions that permit the jury to award damages containing elements that may not be properly awarded are properly refused. *Skorich v. Kochan* (1977), 173 Ind.App. 413, 363 N.E.2d 1081. Tendered instruction no. 3 would have permitted the jury to award TEN damages, under the instruction's first and third elements as set out above, for which it lacked the standing to assert. Therefore, we hold the trial court did not err in refusing to give instruction No. 3 to the jury.

Judgment affirmed.

HOFFMAN, P.J., concurs.

SULLIVAN, J., dissents with separate opinion.

SULLIVAN, Judge, dissenting.

The representations relied upon by TEN, Wheeler, Brown and Bird as the basis of their claim were much more in the realm of opinion and "trade talk" than statements of past or existing *material* facts.

To the minimal extent that Warren's representations were of past or existing fact rather than of opinion or future projection, and to the extent that they were inaccurate at the time made, such could not have been the cause of losses to plaintiffs. Those representations were met or even exceeded before plaintiffs experienced financial losses. The representations in question, as a matter of law, could not have caused compensable damages.

To the extent that one or more representations may not have been accurate at the time made, and did not become factual in time, plaintiff's either knew of the inaccuracy or because of the circumstances were not justified in relying upon them. To recover in fraud, a plaintiff must prove reliance and, in addition, that such reliance was reasonable under the circumstances. *Tutwiler v. Snodgrass* (1981) 2nd Dist., Ind.App., 428 N.E.2d 1291. As stated long ago in *Culley v. Jones* (1905) 164 Ind. 168, 73 N.E. 94:

"Representations might be ... harmless when addressed to an active, sagacious, well-informed man, and yet might utterly mislead [a person] ... incapable of intelligently transacting business of magnitude involving large sums of money. The design of the law is to protect the weak and credulous from the wiles and stratagems of the artful and the cunning, as well as those whose vigilance and sagacity enable them to protect themselves." 164 Ind. at 176.

The purpose of the law and the protections afforded it are not frustrated when the parties, as here, "deal at arm's length with equal means of knowledge." *Wisconics Engineering, Inc. v. Fisher* (1984) 2nd Dist., Ind.App., 466 N.E.2d 745, 756 *trans. denied.* Wheeler, Brown and Bird engaged in a business evaluation with eyes wide open and with full opportunity to discover actual prospects for success. They did in fact know or have ready access to all knowledge concerning the number of subscribers, the incidence of placements, and all other related material information.

It is not the function of the law of fraud to relieve a business person from an investment which upon reflection becomes undesirable. *Plumley v. Stanelle* (1974) 2nd Dist., 160 Ind.App. 271, 311 N.E.2d 626.

I am also at a loss to understand the argument made by TEN, and adopted in the majority opinion, with respect to the theory of damages upon which recovery is made. TEN asserts that no claim is made for losses involved in the conduct of the business as a result of Warren's representations. Rather, it is claimed that but for such representations, Wheeler, Brown and Bird would not have invested time and money in becoming involved in the venture.

To give cognizance to this argument is to bestow validity upon a hypothetical, but parallel, absurdity. Had TEN become an overwhelming financial success and had Wheeler, Brown and Bird become multi-millionaires as a result of their affiliation with ETS and HRIN, they might have sought and recovered substantial damages from Warren for making them the victims of

increased income tax liability and because of the new and uncomfortable pressures of the adulation, privilege and responsibility which accompany corporate success. I know of no conceivable rationale which would permit such damage recovery.

In my view, *American Independent Management Systems, Inc. v. McDaniel* (1982) 3rd Dist. Ind.App., 443 N.E.2d 98, does not provide the authority for the holding here. In *McDaniel,* plaintiffs did make an initial start-up investment for their business in reliance upon American's contractual obligation to provide support materials, training services, investment advice and tax return preparation. None of the contemplated materials or services were forthcoming and American went out of business. That set of circumstances is decidedly different from the business scenario presented in this case. The McDaniels sustained monetary loss, not only initially but on a continuing basis as a result of American's total default and failure to perform. Unlike, the case before us, they sustained recognizable and compensable injury.

Where, as here, no cognizable injury is claimed, there should be no damages.

I would reverse the judgment.